UNITED MINE WORKERS OF AMERICA, DISTRICT 12 *v.* ILLINOIS STATE BAR ASSOCIATION ET AL.

No. 33.  Argued October 17, 1967.—Decided December 5, 1967.

*Harrison Combs* argued the cause for petitioner.  With him on the briefs were *Edmund Burke, Edward L. Carey, Willard P. Owens* and *M. E. Boiarsky.*

*Bernard H. Bertrand* argued the cause and filed a brief for respondents.

218

Briefs of *amici curiae,* urging reversal, were filed by *Jack Greenberg, James M. Nabrit III, Melvyn Zarr* and *Jay H. Topkis* for the NAACP Legal Defense and Educational Fund et al., and by *Victor Rabinowitz* and *Allan Brotsky* for the National Lawyers Guild.

*Joseph A. Ball, John J. Goldberg* and *Samuel O. Pruitt, Jr.,* filed a brief for the State Bar of California, as *amicus curiae,* urging affirmance.

Mr. Justice Black delivered the opinion of the Court.

The Illinois State Bar Association and others filed this complaint to enjoin the United Mine-Workers of America, District 12, from engaging in certain practices alleged to constitute the unauthorized practice of law. The essence of the complaint was that the Union had employed a licensed attorney on a salary basis to represent any of its members who wished his services to prosecute workmen's compensation claims before the Illinois Industrial Commission. The trial court found from facts that were not in dispute that employment of an attorney by the association for this purpose did constitute unauthorized practice and permanently enjoined the Union from "[e]mploying attorneys on salary or retainer basis to represent its members with respect to Workmen's Compensation claims and any and all other claims which they may have under the statutes and laws of Illinois."[1] The

[1] In addition to the portion just quoted, the court's decree enjoins the Union from:

"1. Giving legal counsel and advice

"2. Rendering legal opinions

"3. Representing its members with respect to Workmen's Compensation claims and any and all other claims which they may have under the laws and statutes of the State of Illinois

"4. [Quoted above]

"5. Practicing law in any form either directly or indirectly."

It is conceded that the Union's employment of an attorney was the basis for these other provisions of the injunction, and it was not

Illinois Supreme Court rejected the Mine Workers' contention that this decree abridged their freedom of speech, petition, and assembly under the First and Fourteenth Amendments and affirmed. We granted certiorari, 386 U. S. 941 (1967), to consider whether this holding conflicts with our decisions in *Railroad Trainmen* v. *Virginia Bar*, 377 U. S. 1 (1964), and *NAACP* v. *Button*, 371 U. S. 415 (1963).

As in the *Trainmen* case, we deal here with a program that has been in successful operation for the Union members for decades. Shortly after enactment of the Illinois Workmen's Compensation Statute [2] in 1911, the Mine Workers realized that some form of mutual protection was necessary to enable them to enjoy in practice the many benefits that the statute promised in theory. At the Union's 1913 convention the secretary-treasurer reported that abuses had already developed: "the interests of the members were being juggled and even when not, they were required to pay forty or fifty per cent of the amounts recovered in damage suits, for attorney fees." In response to this situation the convention instructed the Union's incoming executive board to establish the "legal department" which is now attacked for engaging in the unauthorized practice of law.

The undisputed facts concerning the operation of the Union's legal department are these. The Union employs one attorney on a salary basis to represent members and their dependents in connection with claims for personal injury and death under the Illinois Workmen's Compensation Act. The terms of the attorney's employment, as outlined in a letter from the acting president of the Union to the present attorney, include the following

claimed that the Union was otherwise engaged in the practice of law. Our opinion and holding is therefore limited to this one aspect of the Union's activities.

[2] Ill. Rev. Stat., c. 48, § 138.1 *et seq.* (1963).

specific provision: "You will receive no further instructions or directions and have no interference from the District, nor from any officer, and your obligations and relations will be to and with only the several persons you represent." The record shows no departure from this agreement. The Union provides injured members with forms entitled "Report to Attorney on Accidents" and advises them to fill out these forms and send them to the Union's legal department. There is no language on the form which specifically requests the attorney to file with the Industrial Commission an application for adjustment of claim on behalf of the injured member, but when one of these forms is received, the attorney presumes that it does constitute such a request. The members may employ other counsel if they desire, and in fact the Union attorney frequently suggests to members that they can do so. In that event the attorney is under instructions to turn the member's file over to the new lawyer immediately.

The applications for adjustment of claim are prepared by secretaries in the Union offices, and are then forwarded by the secretaries to the Industrial Commission.[3] After the claim is sent to the Commission, the attorney prepares his case from the file, usually without discussing the claim with the member involved. The attorney determines what he believes the claim to be worth, presents his views to the attorney for the respondent coal company during prehearing negotiations, and attempts to reach a settlement. If an agreement between opposing counsel is reached, the Union attorney will notify the injured member, who then decides, in light

---

[3] The Union's present attorney, who was the only witness on this matter, testified that the application to be filed with the Industrial Commission was dictated by him to the secretaries, who prepared this form under his direction. R. 18, 40. See also R. 58 (Union's answers to interrogatories).

of his attorney's advice, whether or not to accept the offer. If no settlement is reached, a hearing is held before the Industrial Commission, and unless the attorney has had occasion to discuss a settlement proposal with the member, this hearing will normally be the first time the attorney and his client come into personal contact with each other. It is understood by the Union membership, however, that the attorney is available for conferences on certain days at particular locations. The full amount of any settlement or award is paid directly to the injured member. The attorney receives no part of it, his entire compensation being his annual salary paid by the Union.

The Illinois Supreme Court rejected petitioner's contention that its members had a right, protected by the First and Fourteenth Amendments, to join together and assist one another in the assertion of their legal rights by collectively hiring an attorney to handle their claims. That court held that our decision in *Railroad Trainmen* v. *Virginia Bar, supra,* protected plans under which workers were advised to consult specific attorneys, but did not extend to protect plans involving an explicit hiring of such attorneys by the union. The Illinois court recognized that in *NAACP* v. *Button, supra,* we also held protected a plan under which the attorneys recommended to members were actually paid by the association, but the Illinois court viewed the *Button* case as concerned chiefly with litigation that can be characterized as a form of political expression. We do not think our decisions in *Trainmen* and *Button* can be so narrowly limited. We hold that the freedom of speech, assembly, and petition guaranteed by the First and Fourteenth [4] Amendments gives petitioner the right to

---

[4] The freedoms protected against federal encroachment by the First Amendment are entitled under the Fourteenth Amendment to the same protection from infringement by the States. See, *e. g.,*

hire attorneys on a salary basis to assist its members in the assertion of their legal rights.

We start with the premise that the rights to assemble peaceably and to petition for a redress of grievances are among the most precious of the liberties safeguarded by the Bill of Rights. These rights, moreover, are intimately connected, both in origin and in purpose, with the other First Amendment rights of free speech and free press. "All these, though not identical, are inseparable." *Thomas* v. *Collins,* 323 U. S. 516, 530 (1945). See *De Jonge* v. *Oregon,* 299 U. S. 353, 364 (1937). The First Amendment would, however, be a hollow promise if it left government free to destroy or erode its guarantees by indirect restraints so long as no law is passed that prohibits free speech, press, petition, or assembly as such. We have therefore repeatedly held that laws which actually affect the exercise of these vital rights cannot be sustained merely because they were enacted for the purpose of dealing with some evil within the State's legislative competence, or even because the laws do in fact provide a helpful means of dealing with such an evil. *Schneider* v. *State,* 308 U. S. 147 (1939); *Cantwell* v. *Connecticut,* 310 U. S. 296 (1940).

The foregoing were the principles we invoked when we dealt in the *Button* and *Trainmen* cases with the right of an association to provide legal services for its members. That the States have broad power to regulate the practice of law is, of course, beyond question. See *Trainmen, supra,* at 6. But it is equally apparent that broad rules framed to protect the public and to preserve respect for the administration of justice can in their actual operation significantly impair the value of associational freedoms. Thus in *Button, supra,* we dealt with a plan under which the NAACP not only advised prospective

New York Times Co. v. *Sullivan,* 376 U. S. 254, 276–277 (1964), and cases there cited.

litigants to seek the assistance of particular attorneys but in many instances actually paid the attorneys itself. We held the dangers of baseless litigation and conflicting interests between the association and individual litigants far too speculative to justify the broad remedy invoked by the State, a remedy that would have seriously crippled the efforts of the NAACP to vindicate the rights of its members in court. Likewise in the *Trainmen* case there was a theoretical possibility that the union's interests would diverge from that of the individual litigant members, and there was a further possibility that if this divergence ever occurred, the union's power to cut off the attorney's referral business could induce the attorney to sacrifice the interests of his client. Again we ruled that this very distant possibility of harm could not justify a complete prohibition of the Trainmen's efforts to aid one another in assuring that each injured member would be justly compensated for his injuries.

We think that both the *Button* and *Trainmen* cases are controlling here. The litigation in question is, of course, not bound up with political matters of acute social moment, as in *Button,* but the First Amendment does not protect speech and assembly only to the extent it can be characterized as political. "Great secular causes, with small ones, are guarded. The grievances for redress of which the right of petition was insured, and with it the right of assembly, are not solely religious or political ones. And the rights of free speech and a free press are not confined to any field of human interest." *Thomas* v. *Collins, supra,* at 531. And of course in *Trainmen,* where the litigation in question was, as here, solely designed to compensate the victims of industrial accidents, we rejected the contention made in dissent, see 377 U. S., at 10 (Clark, J.), that the principles announced in *Button* were applicable only to litigation for political purposes. See 377 U. S., at 8.

Nor can the case at bar be distinguished from the *Trainmen* case in any persuasive way.[5]  Here, to be sure, the attorney is actually paid by the Union, not merely the beneficiary of its recommendations.  But in both situations the attorney's economic welfare is dependent to a considerable extent on the good will of the union, and if the temptation to sacrifice the client's best interests is stronger in the present situation, it is stronger to a virtually imperceptible degree.  In both cases, there was absolutely no indication that the theoretically imaginable divergence between the interests of union and member ever actually arose in the context of a particular lawsuit; indeed in the present case the Illinois Supreme Court itself described the possibility of conflicting interests as, at most, "conceivabl[e]."

It has been suggested that the Union could achieve its goals by referring members to a specific lawyer or lawyers and then reimbursing the members out of a common fund for legal fees paid.  Although a committee of the American Bar Association, in an informal opinion, may have approved such an arrangement,[6] we think the

[5] It is irrelevant that the litigation in *Trainmen* involved statutory rights created by Congress, while the litigation in the present case involved state-created rights.  Our holding in *Trainmen* was based not on State interference with a federal program in violation of the Supremacy Clause but rather on petitioner's freedom of speech, petition, and assembly under the First and Fourteenth Amendments, and this freedom is, of course, as extensive with respect to assembly and discussion related to matters of local as to matters of federal concern.

[6] American Bar Association, Standing Committee on Professional Ethics, Informal Opinion No. 469 (December 26, 1961).  The ABA committee did not in fact consider the problem presented where the union not only pays the fee but also recommends the specific attorney, and it strongly implied that it would reach a different result in such a situation: "there is nothing unethical in the situations which you describe so long as the participation of the employer, association or union is confined to payment of or reimbursement for legal expenses only."

view of the Illinois Supreme Court is more relevant on this point. In the present case itself the Illinois court stressed that where a union recommends attorneys to its members, "any 'financial connection of any kind' " between the union and such attorneys is illegal.[7] It cannot seriously be argued, therefore, that this alternative arrangement would be held proper under the laws of Illinois.

The decree at issue here thus substantially impairs the associational rights of the Mine Workers and is not needed to protect the State's interest in high standards of legal ethics. In the many years the program has been in operation, there has come to light, so far as we are aware, not one single instance of abuse, of harm to clients, of any actual disadvantage to the public or to the profession, resulting from the mere fact of the financial connection between the Union and the attorney who represents its members. Since the operative portion of the decree prohibits any financial connection between the attorney and the Union, the decree cannot stand; and to the extent any other part of the decree forbids this arrangement it too must fall.

The judgment and decree are vacated and the case is remanded for proceedings not inconsistent with this opinion.

*It is so ordered.*

MR. JUSTICE STEWART concurs in the result upon the sole ground that the disposition of this case is controlled by *Railroad Trainmen* v. *Virginia Bar,* 377 U. S. 1.

MR. JUSTICE HARLAN, dissenting.

This decision cuts deeply into one of the most traditional of state concerns, the maintenance of high

---

[7] 35 Ill. 2d 112, 118, 219 N. E. 2d 503, 506 (1966), quoting *In re Brotherhood of R. R. Trainmen,* 13 Ill. 2d 391, 150 N. E. 2d 163 (1958).

standards within the state legal profession. I find myself unable to subscribe to it.

The Canons of Professional Ethics of the Illinois State Bar Association forbid the unauthorized practice of law by any lay agency.[1] The Illinois Supreme Court, acting in light of these canons and in exercise of its common-law power of supervision over the Bar,[2] prohibited the United Mine Workers of America, District 12, from employing a salaried lawyer to represent its members in workmen's compensation actions before the Illinois Industrial Commission. I do not believe that this regulation of the legal profession infringes upon the rights of speech, petition, or assembly of the Union's members, assured by the Fourteenth Amendment.

I.

As I stated at greater length in my dissenting opinion in *NAACP* v. *Button,* 371 U. S. 415, 448, 452–455, the freedom of expression guaranteed against state interference by the Fourteenth Amendment includes the liberty of individuals not only to speak but also to unite to make their speech effective. The latter right encompasses the right to join together to obtain judicial redress. However, litigation is more than speech; it is conduct. And the States may reasonably regulate conduct even though it is related to expression. The pivotal point is how these competing interests should be resolved in this instance.

----

[1] Canons 35, 47, Canons of Ethics of the Illinois State Bar Association. These canons are identical to the corresponding canons of the American Bar Association.

[2] Even in the absence of applicable statutes, state courts have held themselves empowered to promulgate and enforce standards of professional conduct drawn from the common law and the closely related prohibitions of the Canons of Ethics. See, *e. g., In re Maclub of America, Inc.,* 295 Mass. 45, 3 N. E. 2d 272, and cases therein cited. See generally Drinker, Legal Ethics 26–30, 35–48.

My brethren are apparently in accord. The majority begins by noting that this activity of the Union is related to expression and therefore is of a type which may be sheltered from state regulation by the Constitution. But the majority's inquiry does not stop there; it goes on to examine the state concerns and concludes that the decree "is not needed to protect the State's interest in high standards of legal ethics." See *ante,* at 225.[3] I agree, of course, with this "balancing" approach. See, *e. g., NAACP* v. *Button, supra,* at 452–455 (dissenting opinion); *Konigsberg* v. *California Bar,* 366 U. S. 36, 49–51; *Talley* v. *California,* 362 U. S. 60, 66 (concurring opinion). Indeed, I cannot conceive of any other sound method of attacking this type of problem. For if an "absolute" approach were adopted, as some members of this Court have from time to time insisted should be so with "First Amendment" cases,[4] and the state interest in regulation given no weight, there would be no appar-

---

[3] This weighing of the competing interests involved is the same approach as that used in *NAACP* v. *Button,* 371 U. S. 415, and in *Railroad Trainmen* v. *Virginia Bar,* 377 U. S. 1. However, since a new balance must be struck whenever the competing interests are significantly different, this decision is not controlled by those cases. The union members in this case are not asserting legal rights which stem either from the Constitution or from a federal statute, sources of origin stressed respectively in *Button,* see 371 U. S., at 429–431, 441–444, and in *Railroad Trainmen,* see 377 U. S., at 3–6. Furthermore, the union plan at issue here differs from the referral practice involved in *Railroad Trainmen* because it involves the services of a union-salaried lawyer.

Similarly, the interests in this case are very different from those in cases involving legal aid to the indigent. The situation of a salaried lawyer representing indigent clients was expressly distinguished by the court below. See 35 Ill. 2d 112, 121, 219 N. E. 2d 503, 508.

[4] See, *e. g., Lathrop* v. *Donohue,* 367 U. S. 820, 865, 871–874 (dissenting opinion); *Konigsberg* v. *California Bar,* 366 U. S. 36, 56, 60–71 (dissenting opinion).

ent reason why, for example, a group might not employ a layman to represent its members in court or before an agency because it felt that his low fee made up for his deficiencies in legal knowledge. Cf. *Hackin* v. *Arizona, ante,* p. 143 (DOUGLAS, J., dissenting).

## II.

Although I agree with the balancing approach employed by the majority, I find the scales tip differently. I believe that the majority has weighed the competing interests badly, according too much force to the claims of the Union and too little to those of the public interest at stake. As indicated previously, the interest of the Union stems from its members' constitutionally protected right to seek redress in the courts or, as here, before an agency. By the plan at issue, the Union has sought to make it easier for members to obtain benefits under the Illinois Workmen's Compensation Act.[5] The plan is evidently designed to help injured union members in three ways: (1) by assuring that they will have knowledge of and access to an attorney capable of handling their claims; (2) by guaranteeing that they will not be charged excessive legal fees; and (3) by protecting them from crippling, even though reasonable, fees by making legal costs payable collectively through union dues. These are legitimate and laudable goals. However, the union plan is by no means necessary for their achievement. They all may be realized by methods which are proper under the laws of Illinois.

The Illinois Supreme Court in this case repeated its statement in a prior case that a union may properly make known to its members the names of attorneys it deems capable of handling particular types of claims.[6]

---

[5] Ill. Rev. Stat., c. 48, § 138.1 *et seq.* (1963).

[6] See 35 Ill. 2d, at 118–119, 219 N. E. 2d, at 506–507. The earlier Illinois decision referred to was *In re Brotherhood of R. R. Trainmen,* 13 Ill. 2d 391, 150 N. E. 2d 163.

Such union notification would serve to assure union members of access to competent lawyers.

As regards the protection of union members against the charging of unreasonable fees, a fully efficient safeguard would seem to be found in the Illinois Workmen's Compensation Act itself. An amendment to the Act in 1915, shortly after its initial passage,[7] provided that the Industrial Commission

> "shall have the power to determine the reasonableness and fix the amount of any fee or compensation charged by any person for any service performed in connection with this Act, or for which payment is to be made under this Act or rendered in securing any right under this Act." [8]

In 1927, the words "including attorneys, physicians, surgeons and hospitals" were added following the phrase "or compensation charged by any person." [9]  Thus, there would now appear to be no reasonable grounds for fearing that union members will be subjected to excessive legal fees.

The final interest sought to be promoted by the present plan is in the collective payment of legal fees. That objective could presumably be realized by imposing assessments on union members for the establishment of a fund out of which injured members would be reimbursed for their legal expenses.[10]  There is no reason to believe that this arrangement would be improper under Illinois law, since the union's obligation would run only to the

---

[7] It may be significant that the union plan was instituted in 1913, prior to this amendment of the Act.  See *ante*, at 219.

[8] Ill. Laws, 1915, p. 408.

[9] Ill. Laws, 1927, p. 511.

[10] Cf. American Bar Association, Committee on Professional Ethics, Informal Opinion No. 469 (December 26, 1961) (union may reimburse member client for legal expenses).

member and there would be no financial connection between union and attorney.

The regulatory interest of the State in this instance is found in the potential for abuse inherent in the union plan. The plan operates as follows. The Union employs a licensed lawyer on a salary basis [11] to represent members and their dependents in connection with their claims under the Workmen's Compensation Act. Members are told that they may employ other attorneys if they wish. The attorney is selected by the Executive Board of District 12, and the terms of employment specify that the attorney's sole obligation is to the person represented and that there will be no interference by the Union. Injured union members are furnished by the Union with a form which advises them to send the form to the Union's legal department. Upon receipt of the form, the attorney assumes it to constitute a request that he file on behalf of the injured member a claim with the Industrial Commission, though no such explicit request is contained in the form. The application for compensation is prepared by secretaries in the union offices, and when complete it is sent directly to the Industrial Commission. In most instances, the attorney has neither seen nor talked with the union member at this stage, though the attorney is available for consultation at specified times. After the filing of the claim and prior to the hearing before the Commission, the attorney prepares for its presentation by resorting to his file and to the application, usually without conferring with the injured member. Ordinarily the member and this attorney first meet at the time of the hearing before the Commission.

---

[11] The salary paid at the time of this action was $12,400 per annum.

The attorney determines what he thinks the claim to be worth and attempts to settle with the employer's attorney during prehearing negotiations. If agreement is reached, the attorney recommends to the injured member that he accept the result. If no settlement occurs, a hearing on the merits is held before the Industrial Commission. The full amount of the settlement or award is paid to the injured member. The attorney retains for himself no part of the amount received, his sole compensation being his annual salary paid by the Union.

This union plan contains features which, in my opinion, Illinois may reasonably consider to present the danger of lowering the quality of representation furnished by the attorney to union members in the handling of their claims. The union lawyer has little contact with his client. He processes the applications of injured members on a mass basis. Evidently, he negotiates with the employer's counsel about many claims at the same time. The State was entitled to conclude that, removed from ready contact with his client, insulated from interference by his actual employer, paid a salary independent of the results achieved, faced with a heavy caseload,[12] and very possibly with other activities competing for his time,[13] the attorney will be tempted to place undue emphasis upon quick disposition of each case. Conceivably, the desire to process forms rapidly might influence the lawyer not to check with his client regarding ambiguities or omissions in the form, or to miss facts and circumstances which face-to-face consultation with his client would

---

[12] The attorney employed by the Union in this case handled more than 400 workmen's compensation claims a year.

[13] The attorney employed by the Mine Workers was also an Illinois state senator and had a private practice other than the Mine Workers' representation.

have brought to light. He might be led, so the State might consider, to compromise cases for reasons unrelated to their own intrinsic merits, such as the need to "get on" with negotiations or a promise by the employer's attorney of concessions relating to other cases. The desire for quick disposition also might cause the attorney to forgo appeals in some cases in which the amount awarded seemed unusually low.[14]

## III.

Thus, there is solid support for the Illinois Supreme Court's conclusion that the union plan presents a danger of harm to the public interest in a regulated bar. The reasonableness of this result is further buttressed by the numerous prior decisions, both in Illinois and elsewhere, in which courts have prohibited the employment of salaried attorneys by groups for the benefit of their members.[15]

The majority dismisses the State's interest in regulation by pointing out that there have been no proven instances of abuse or actual disadvantage to union members resulting from the operation of the union plan. See *ante,* at 225. But the proper question is not whether

[14] Of 351 workmen's compensation cases, from all sources, which were appealed to the Illinois courts during the period 1936–1967, only one was appealed by a miner affiliated with District 12. No such miner has appealed since 1942. See Respondents' Brief, at 17–18.

[15] See, *e. g., People ex rel. Courtney* v. *Association of Real Estate Tax-payers,* 354 Ill. 102, 187 N. E. 823; *In re Maclub of America, Inc.,* 295 Mass. 45, 3 N. E. 2d 272, and cases therein cited; *Richmond Assn. of Credit Men, Inc.* v. *Bar Assn. of Richmond,* 167 Va. 327, 189 S. E. 153. The Canons of Ethics of the American Bar Association have also been interpreted as forbidding arrangements of the kind at issue here. See American Bar Association, Committee on Unauthorized Practice of the Law, Informative Opinion No. A of 1950, 36 A. B. A. J. 677.

this particular plan has in fact caused any harm.[16] It is, instead, settled that in the absence of any dominant opposing interest a State may enforce prophylactic measures reasonably calculated to ward off foreseeable abuses, and that the fact that a specific activity has not yet produced any undesirable consequences will not exempt it from regulation. See, *e. g., Hoopeston Canning Co.* v. *Cullen,* 318 U. S. 313, 321–322; *Daniel* v. *Family Sec. Life Ins. Co.,* 336 U. S. 220, 222–225.

It is also irrelevant whether we would proscribe the union plan were we sitting as state judges or state legislators. The sole issue before us is whether the Illinois Supreme Court is forbidden to do so because the plan unduly impinges upon rights guaranteed to the Union's members by the Fourteenth Amendment. Since the finding that the union plan presents dangers to the public and legal profession is not an arbitrary one, and since the limitation upon union members is so slight, in view of the permissible alternatives still open to them, I would hold that there has been no denial of constitutional rights occasioned by Illinois' prohibition of the plan.

### IV.

This decision, which again manifests the peculiar insensitivity to the need for seeking an appropriate constitutional balance between federal and state authority that in recent years has characterized so many of the Court's decisions under the Fourteenth Amendment,

---

[16] It is possible that the operation of the plan did result in union members receiving a lower quality of legal representation than they otherwise would have had. For example, the Mine Workers' present attorney recovered an average of $1,160 per case, while his predecessor secured an average of $1,350, even though the permissible rates of recovery were lower during the predecessor's tenure. See Record, at 53–54, 58–60; Brief for Respondents 18. See also n. 14, *supra.*

puts this Court more deeply than ever in the business of supervising the practice of law in the various States. From my standpoint, what is done today is unnecessary, undesirable, and constitutionally all wrong. In the absence of demonstrated arbitrary or discriminatory regulation, state courts and legislatures should be left to govern their own Bars, free from interference by this Court.[17] Nothing different accords with longstanding and unquestioned tradition and with the most elementary demands of our federal system.

I would affirm.

---

[17] It has been suggested both in this case and elsewhere, cf. *Hackin* v. *Arizona, ante,* p. 143 (DOUGLAS, J., dissenting), that prevailing Canons of Ethics and traditional customs in the legal profession will have to be modified to keep pace with the needs of new social developments, such as the Federal Poverty Program. That may well be true, but such considerations furnish no justification for today's heavy-handed action by the Court. The American Bar Association and other bodies throughout the country already have such matters under consideration. See, *e. g.,* 1964 ABA Reports 381–383 (establishment of Special Committee on Ethical Standards); 1966 ABA Reports 589–594 (Report of Special Committee on Availability of Legal Services); 39 Calif. State Bar Journal 639–742 (Report of Committee on Group Legal Services). Moreover, the complexity of these matters makes them especially suitable for experimentation at the local level. And, all else failing, the Congress undoubtedly has the power to implement federal programs by establishing overriding rules governing legal representation in connection therewith.