Argued and submitted October 29, 2004, on appeal, reversed and remanded on plaintiff's 42 USC section 1983 claim for violation of his rights under the First Amendment to the United States Constitution; otherwise affirmed; cross-appeal dismissed as moot March 23, 2005

Ali JAMSHIDNEJAD,
Guardian Ad Litem for David Jamshidnejad,
a Minor Child,
*Appellant - Cross-Respondent,*

*v.*

CENTRAL CURRY SCHOOL DISTRICT,
Tom Denning, and Robert Snyder,
*Respondents - Cross-Appellants.*

01CV0321; A118486

108 P3d 671

Manuel C. Hernandez argued the cause for appellant - cross-respondent. With him on the briefs was Hernandez and Associates, L.L.C.

Paul A. Dakopolos argued the cause for respondents - cross-appellants. With him on the briefs was Garrett, Hemann, Robertson, Jennings, Comstock & Trethewy, P.C. With him on the cross-reply brief was Tracy A. Prall.

Before Edmonds, Presiding Judge, and Wollheim and Schuman, Judges.

SCHUMAN, J.

Edmonds, P. J., concurring in part, dissenting in part.

**SCHUMAN, J.**

Defendant suspended plaintiff Jamshidnejad from middle school for four days after an allegedly disruptive occurrence involving offensive petitions.[1] Plaintiff then brought this action, claiming "outrageous conduct" and violations of various constitutional rights under 42 USC section 1983.[2] The trial court granted defendant's motion for summary judgment. Plaintiff appeals, assigning error only to the trial court's grant of summary judgment as to the constitutional claims, and defendant cross-appeals, assigning error to the trial court's denial of its motion for enhanced prevailing party fees. Only one issue merits discussion: plaintiff's claim for damages based on an asserted violation of his free speech rights. On that issue, we reverse and remand. In light of that disposition, the cross-appeal is moot and we therefore dismiss it. On all other claims at issue in the appeal, we affirm.

The relevant undisputed facts are as follows. In March 2001, when plaintiff was an eighth-grade student at Riley Creek Middle School in Curry County, his principal, Denning, discovered a number of petitions. One sought the firing of Denning and another declared that Denning was "gay." A third petition, the subject of plaintiff's free speech claim, declared that a teacher at the school, Ms. Weinhold, was "the devil." Although it is undisputed that plaintiff was present when the "devil petition" was created and that he wrote a list of synonyms for "devil," the extent of any other participation by him in its creation, if any, is unclear from the record. The principal drafter of the petition was plaintiff's

---

[1] This action was brought on behalf of David Jamshidnejad, a minor, by Ali Jamshidnejad, guardian ad litem. References to "plaintiff" in this opinion are to David Jamshidnejad. We refer to Central Curry School District, Tom Denning, and Robert Snyder collectively as "defendant."

[2] 42 USC section 1983 provides, in part:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State * * * subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]"

Section 1983 claims may be brought in state court. *See Rogers v. Saylor,* 306 Or 267, 760 P2d 232 (1988).

schoolmate, J. Plaintiff wrote the list of synonyms for "devil" on a page that is separate from the petition itself; the petition does not contain any of the synonyms; and we cannot discern whether or not the list was circulated with the petition.

After Denning discovered the "devil petition," he showed it to Weinhold, who became upset and left school. Several students whose names appeared on the petitions were questioned, and some stated that they had been coerced into signing. Plaintiff denied participating in any coercion, although he stated that he was present when the petitions were circulated. After an investigation, the Gold Beach Police Department concluded that plaintiff was involved in creating the petitions and in asking or coercing others to sign them.

On March 19, 2001, Denning met with plaintiff, plaintiff's father, and the investigating officer to discuss the petitions. At the end of the conversation, Denning suspended plaintiff from school for the rest of that week, which consisted of the four days preceding the upcoming spring break. Denning reported that many students were upset by the effect of the petition on Weinhold and blamed plaintiff. He advised that plaintiff should stay away from school for his own safety. Plaintiff complied. A transcript of the meeting also indicates that Denning discussed his concern about plaintiff's alleged involvement in creating the petitions and about reports that plaintiff coerced students into signing them.[3]

Plaintiff brought this action under 42 USC section 1983 against the school district, its superintendent, and Denning for infringement of his rights to due process, equal protection, and free speech under the federal constitution; for "outrageous conduct," by which we assume that he meant intentional infliction of emotional distress; and for "denial of free public education." After the court dismissed plaintiff's claims, defendant moved for an enhanced prevailing party fee. The court denied that claim.

---

[3] After the spring break, reports circulated at school that plaintiff claimed to have a gun, that he told another student that she was on a "hit list," and that he brought a bullet to school. The charges were subsequently investigated and plaintiff was disciplined. Plaintiff's claim for violation of his free speech rights does not encompass those post-spring break events and the discipline imposed for them.

■ In arguing the First Amendment issue—the only issue on appeal that merits discussion—the parties cited relevant federal cases involving free speech in schools[4] but focused their legal analysis on whether or not plaintiff's speech dealt with a "matter of public concern," and it was on that basis that the trial court decided in favor of defendants: "I think I can assume, basically, [counsel], all the facts that you're claiming here and the free speech that we're talking about here was not a matter of public concern." The trial court subsequently granted defendant's motion for summary judgment on all claims and denied defendant's motion for prevailing party fees.

The parties' arguments and the court's rationale presume an entirely erroneous interpretation of the First Amendment, namely, that it protects speech regarding matters of public concern and nothing more. It is true that, in one case, *Connick v. Myers*, 461 US 138, 146, 103 S Ct 1684, 75 L Ed 2d 708 (1983), the Court held that a public employer committed no First Amendment violation by firing a public employee who, in her capacity as such, expressed herself on a matter of purely private concern. That is a far cry from an exhaustive statement of the First Amendment's scope. In fact, the Court immediately added:

> "We do not suggest, however, that [the employee's] speech, even if not touching upon a matter of public concern, is totally beyond the protection of the First Amendment. 'The First Amendment does not protect speech and assembly only to the extent it can be characterized as political. "Great secular causes, with smaller ones, are guarded." ' *United Mine Workers v. Illinois State Bar Association*, 389 U.S. 217, 223, 88 S. Ct. 353, 356, 19 L. Ed. 2d 426 (1967), *quoting Thomas v. Collins*, 323 U.S. 516, 531, 65 S. Ct. 315, 323, 89 L. Ed. 430 (1945). We in no sense suggest that speech on private matters falls into one of the narrow and well-defined classes of expression which carries so little social value, such as obscenity, that the State can prohibit and punish such expression by all persons in its jurisdiction."

---

[4] *Hazelwood School District v. Kuhlmeier*, 484 US 260, 108 S Ct 562, 98 L Ed 2d 592 (1988); *Bethel School Dist. No. 403 v. Fraser*, 478 US 675, 106 S Ct 3159, 92 L Ed 2d 549 (1986); *Tinker v. Des Moines Independent Community School Dist.*, 393 US 503, 89 S Ct 733, 21 L Ed 2d 731 (1969).

*Connick*, 461 US at 147. Thus, the First Amendment has long protected offensive artistic speech, *FCC v. Pacifica Foundation*, 438 US 726, 98 S Ct 3026, 57 L Ed 2d 1073 (1978); semi-nude dancing, *Barnes v. Glen Theatre, Inc.*, 501 US 560, 111 S Ct 2456, 115 L Ed 2d 504 (1991); personal invective short of "fighting words," *Gooding v. Wilson*, 405 US 518, 92 S Ct 1103, 31 L Ed 2d 408 (1972); advertising, *Virginia Pharmacy Board v. Virginia Citizens Consumer Council, Inc.*, 425 US 748, 96 S Ct 1817, 48 L Ed 2d 346 (1976); and a host of other forms of expression having no relationship to matters of public concern beyond the public concern generated by government's attempt to stifle it.

■■ The fact that the court reached its decision based on an erroneous rationale, however, does not mean that we must reverse. We can affirm nonetheless if we can determine from the record that the court was "right for the wrong reason." *Outdoor Media Dimensions Inc. v. State of Oregon*, 331 Or 634, 659, 20 P3d 180 (2001). In the present case, that means that we may affirm if, on *de novo* review of the record, we find undisputed assertions of material fact that would compel the conclusion that plaintiff was either suspended for reasons unrelated to speech; or that, if he was suspended for speech, it was unprotected speech because it was disruptive or potentially disruptive. ORCP 47 C; *Pangle v. Bend-LaPine School District*, 169 Or App 376, 10 P3d 275 (2000), *rev den*, 332 Or 558 (2001).[5] We conclude that, on the record as it now exists, disputed questions of fact exist with respect to each of the theories that might support affirmance.

We begin with the question of why plaintiff was suspended. Tautologically, if he was suspended for reasons apart from speech, then his First Amendment claim must fail. Defendant argues that the purpose of the suspension was not to punish plaintiff for his contribution to the petitions but to

---

[5] In *Pangle*, we noted that the appropriate standard of review in a section 1983 case is the same as it would be if the case were tried in federal court, and that "[w]hen a federal district court upholds a restriction on speech as constitutional, the Ninth Circuit Court of Appeals conducts a *de novo* review unless the district court has made specific findings on disputed fact issues[.]" 169 Or App at 394. The trial court in this case made no such findings. We take the mandate to conduct "a *de novo* review" to mean that we afford no deference to the trial court's implicit findings.

protect him from retaliation by his fellow students and to punish him for coercive acts.

■ We note initially that, even if the purpose was to protect plaintiff from retaliation for speech, that fact does not insulate defendant from liability under the First Amendment. If the speech was lawful, then defendant has an obligation to protect the speaker and cannot meet that obligation by silencing or punishing him. *Gregory v. City of Chicago*, 394 US 111, 120-21, 89 S Ct 946, 22 L Ed 2d 134 (1969) (Black, J., concurring). Thus, the question whether defendant sent plaintiff home for his own protection collapses into the question whether the speech was itself lawful, which we address below.

■ The transcript of the March 19 meeting among plaintiff, plaintiff's father, Denning, and a police officer indicates that Denning suspended plaintiff for several reasons, one of which was reported coercion.

> "And also we're seriously looking at the ones that ahh we've got four or five well three or four students that are saying that they were threatened. In other words, you sign this or we're going to beat you up. And they named [plaintiff and J]. I, I think are the two that threatened and so that's what we're going to be talking to them this morning to get, we want to get the truth. There's a lot of rumors and things going around and that's why we're calling the kids in one by one and we're letting parents be here if they want to be part of it. We're trying to find the truth."

The transcript also contains the following exchange between Denning and plaintiff's father concerning whether plaintiff was being sent home for coercing other students into signing the petition:

> "[Denning:] Okay and also there were the—kids were saying that [plaintiff] threatened them and so ...
>
> "[Plaintiff's father:] That's the part he's saying he did indicate willing to take even though I told might even have to even take lie detector test.
>
> "[Denning:] Ahh ha.
>
> "[Plaintiff's father:] I'm not, I'm just trying to be fair.

"[Denning:] Yeah, well I understand and that's what we're what we're trying to be to [*sic*]. We're going to be calling all the kids in today. We've got a list of fifteen names and we're going to call them in and do the same thing with them, call their parents. It's going to take a while though. And so we're going to find out exactly what happened but we did talk to them after the meeting on Friday and ahh they specifically said [plaintiff] and [J] threatened them. An and different people at different times said that. So that's what we have to find out and get them on tape because maybe their stories will change. Ahh when it comes down to it when its being interviewed by a police officer. And that's what we want to find out. And if [plaintiff] you know we could change the consequence if we find out he didn't threaten anybody then it would change everything completely. But right now we've got kids that are telling us that he did threaten them and that's what we want to find out and get to the bottom of it."

That exchange supports Denning's contention that he sent plaintiff home based at least in part on reports of threatening behavior. Plaintiff, however, contends that he was suspended due to his role in creating the petition, and that theory is supported by numerous statements by Denning at the same meeting:

"[I'm punishing plaintiff and J] right now and then if we find out anyone else wrote [the petitions] then it will be the same thing for them. We've got kids lined up to talk to all morning today. So it's [plaintiff] and [J] right now and possibly more later. Ahh the kids that signed willingly they're going to miss a few recesses or something ahh but the ones that wrote the petition are the ones we're cracking down on right now.

"* * * * *

"[R]ight now [plaintiff is] mainly being suspended, he and [J] are suspended because on Friday they both admitted that they wrote worked together [*sic*] on these documents.

"* * * * *

"Well see the thing is you have every right to do a petition, you know, 'We * * * want to get rid of Mr. Denning as principal.' * * * [Y]ou know that's your right to do that. But

I think where you start accusing people of being the devil, that's where you guys crossed the line."

We conclude that, on the record before the trial court, a disputed issue of fact exists as to whether plaintiff was suspended for conduct and not for speech. We therefore cannot affirm the trial court's grant of summary judgment to defendant on the ground that, as a matter of law, the suspension did not implicate free speech at all.

 Nonetheless, we could affirm the trial court if we could conclude that, as a matter of law, even if the suspension was speech related, the speech was unprotected. Examining that theory requires us to determine what speech in fact could have served as the basis for the suspension. In other words, to determine whether defendant acted lawfully in suspending plaintiff for his speech, we need to know the speech that defendant reacted to. The record in that regard is not clear. Denning, the principal, asserted at the meeting with plaintiff and his father that plaintiff had admitted "helping" his classmate write the petition. Denning thus concluded that, although plaintiff "didn't actually write it, he was part of the authorship of that." At another point, Denning stated that plaintiff and J "worked together on these documents." Plaintiff, however, states that he merely "stood by the table" while J wrote the petition and that he also wrote down a list of synonyms for "devil"[6] because the two boys did not know how to spell the word "devil" itself. Thus, at the time defendant suspended plaintiff, it was undisputed that plaintiff did not himself write the text of the petition but that he did write a list of words.

Furthermore, the dissent's assertion to the contrary notwithstanding, the record does not disclose that the list of words was ever circulated. It is on a sheet of paper separate from the sheet declaring the teacher to be the devil, threatening to beat students who do not agree, and containing student signatures. That sheet contains the word "devil" and no synonyms. Plaintiff's list contains no signatures or anything

---

[6] "Satan, Beelzebub, [illegible], Lucifer, old gooseberry, old nick, old scratch, Serpent, archfiend, dastard: all names for 'the devil.' "

else to indicate that it was circulated, and his affidavit is ambiguous.

The record, therefore, indicates that plaintiff's contribution to the petition consisted of writing the list of synonyms. The record does not demonstrate that the list was ever shown to any students, and it does not demonstrate that what *was* shown to students contained anything that plaintiff wrote. Put another way, a finder of fact could conclude that, at the time defendant suspended plaintiff, defendant knew only that plaintiff had provided the petition's author with an unused and undisclosed list of synonyms for the word "devil."

■ We must therefore determine whether defendant could punish plaintiff for that writing without violating his First Amendment rights. *Pangle* is the most instructive case. There, we held that a student's speech, published in a newsletter, was not constitutionally protected. We summarized the circumstances under which punishment for student speech in a school setting is constitutionally permissible. Drawing together the principles announced by the United States Supreme Court in *Tinker v. Des Moines Independent Community School Dist.*, 393 US 503, 89 S Ct 733, 21 L Ed 2d 73 (1969), *Bethel School Dist. No. 403 v. Fraser*, 478 US 675, 106 S Ct 3159, 92 L Ed 2d 549 (1986), and *Hazelwood School District v. Kuhlmeier*, 484 US 260, 108 S Ct 562, 98 L Ed 2d 592 (1988), we distilled the required analysis and applied it to the speech at issue in that case:

> "[W]e observe that the United States Supreme Court did not hold in *Tinker*, *Fraser* and *Kuhlmeier*, that the 'protected' or 'unprotected' content of the expression was the determinative issue. Rather, the Court determined whether a school district could discipline for the expression in those cases based on the interests inherent in the school's educational mission. * * *
>
> "Thus, the task confronting us in this case is to focus on the issue of any disruption, actual or potential, that the dissemination of [the newsletter] caused to school's educational mission. The importance of maintaining a structured and safe environment is underscored by the compulsory nature of public education in this state. * * * When children are within the school environment, parents must rely on

school personnel to provide a safe and non-disruptive learning environment. As the court noted in *Fraser*, there is an 'obvious concern on the part of parents, and school authorities acting *in loco parentis*, to protect children[.]' School personnel act in a surrogate parent role, insofar as student safety on high school campuses is concerned. *Fraser*, 478 US at 684. The exercise of appropriate discipline to deter disruptive forces within the school environment is as consistent with First Amendment rights as are constitutional limitations on free speech in other environments, such as constraints on yelling 'Fire!' in a crowded movie theater."

*Pangle*, 169 Or App at 394-95. We emphasized that Supreme Court decisions permit schools to curtail not only speech that causes actual disruption but also expressive activity that carries the potential to disrupt the educational environment:

"It does not necessarily follow that expression by a student in a school environment is protected to the same extent that the expression would be protected if made by an adult in a non-school setting. *Kuhlmeier*, 484 US at 266; *Fraser*, 478 US at 682. As the Court has said, '[t]he undoubted freedom to advocate unpopular and controversial views in schools and classrooms must be balanced against the society's countervailing interest in teaching students the boundaries of socially appropriate behavior.' *Fraser*, 478 US at 681. For that reason, it is untenable to argue that the use of vulgar or threatening language not resulting in actual disruption is not subject to discipline. As the Court indicated in *Tinker*, the question is whether the expression will motivate 'actually or potentially disruptive conduct by those participating in it.' 393 US at 505. Finally, '[a] school need not tolerate student speech that is inconsistent with its 'basic educational mission,' even though the government could not censor similar speech outside the school.' *Kuhlmeier*, 484 US at 266 (citation omitted)."

*Pangle*, 169 Or App at 395. Thus, summary judgment was proper in this case only if undisputed facts show that plaintiff actually contributed to the devil petition and that his contribution was disruptive or capable of causing disruption to the school's mission of fostering a learning environment and "teaching students the boundaries of socially appropriate behavior."[7]

---

[7] Plaintiff argues (and defendant disputes) that the devil petition caused no actual disruption until Denning notified others of its contents during his

We noted in *Pangle* that "our analysis must engage with the unique set of factual circumstances present in this case." 169 Or App at 394. The same is true here. Whether plaintiff's speech was disruptive or capable of disruption depends on an array of considerations including the nature of the speech, its content, and the challenge it posed to the school's interests. That analysis is heavily fact-bound. Federal case law indicates certain matters that are relevant to determining whether a student's speech undermines the school's educational goals. For example, the court may look to whether, by their impermissible speech, older students model behavior that contravenes the school's interest in creating a beneficial educational environment; whether the speech is hostile or offensive to certain listeners in particular; and whether students' reactions to the speech exacerbated its unwanted effects. *See Fraser,* 478 US at 682-86 (applying those considerations to determine whether, under the facts of that case, a student's speech interfered with the work of the school or infringed on the rights of others).

From the record in the present case, we cannot determine whether plaintiff's speech, that is, the list of devil synonyms, was employed in creating the petition or circulated with it and if so, whether it was disruptive or capable of disruption under the relevant standard. The facts surrounding the nature of the petition, its authorship, and its dissemination are in dispute. Plaintiff argues that he did not compose any of the petitions, that his list of devil synonyms was separate from the petitions, and that, in any case, "there was no disruption of the school or classroom." Defendant contends that plaintiff coauthored the devil petition and that coercion associated with plaintiff and the petition caused actual disruption, as did the uproar and investigation upon its discovery by Denning. Defendant also argues that facts in the record reflecting events that occurred after Denning discovered the petitions, including the investigation, the reported reaction of the students, and the reaction of Weinhold, amount to

---

investigation. This argument is misplaced; the proper inquiry is whether the petition was disruptive or capable of disruption; the absence of actual disruption is not dispositive. *Pangle,* 169 Or at 395 ("[T]he question is whether the expression will motivate actually or potentially disruptive conduct by those participating in it.") (Internal quotation marks and citation omitted.).

the type and quantum of disruption that justifies imposing discipline for plaintiff's speech, but disputed issues of fact prevent us from gauging the extent, if any, of plaintiff's contribution to those events and reactions.

In short, it is possible that defendant legitimately suspended plaintiff for reasons unrelated to speech; it is possible that, if defendant suspended plaintiff for speech, the suspension was lawful because plaintiff's speech was disruptive or potentially disruptive of the school environment; but, on this record, viewing the facts and inferences drawn from them in the light most favorable to plaintiff, we cannot rule out the possibility that defendant suspended plaintiff for suggesting, orally and in writing, to the author of an offensive petition, that the author substitute a synonym for the word "devil," and that the author rejected the suggestion. For that reason, we conclude that the trial court erred in granting defendant's motion for summary judgment insofar as it applied to plaintiff's claim for a violation of his rights under the First Amendment.

■ On appeal, reversed and remanded on plaintiff's 42 USC section 1983 claim for violation of his rights under the First Amendment to the United States Constitution; otherwise affirmed. Cross-appeal dismissed as moot.

**EDMONDS, P. J.,** concurring in part, dissenting in part.

I agree with the majority's disposition of all of plaintiff's claims with the exception of its reversal of summary judgment on plaintiff's claim under 42 USC section 1983 that the school district violated his freedom of expression under the First Amendment to the United States Constitution when it sent him home from school for his involvement in the preparation and circulation of petitions asserting that one of his middle school teachers was the "devil." I would hold that, based on the evidence before it, the school district acted constitutionally because plaintiff's expression adversely affected or could have disrupted the educational mission of his school.

This case comes to us on appeal from the grant of summary judgment by the trial court under ORCP 47 C. That rule provides that a court is authorized to enter summary

judgment on behalf of a party if "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Factual disputes that are not material to a judgment as a matter of law do not preclude summary judgment under the rule. Here, while there are reasonable competing inferences as to whether plaintiff was, in fact, suspended from school because of his involvement with the petitions, there is, based on his own admissions, no genuine issue of material fact regarding the entitlement of the school district to lawfully discipline him, including suspending him from school.

To preclude summary judgment, the governing law required plaintiff to make out a legally cognizable section 1983 claim that the school district violated his protected right of free speech under the First Amendment. Plaintiff makes the following allegations in that regard:

"5

"On or about March 19, 2001, plaintiff was questioned by police and Mr. Tom Denning, Principal of Riley Creek School, regarding his knowledge of a petition in which a teacher was identified as 'the Devil.'

"6

"At the end of this interview, Plaintiff was summarily suspended from attending school for the remainder of the week, a period of 4 days. No written notice was provided to Plaintiff's parents and no opportunity for a hearing on the matter was provided.

"7

"Plaintiff was accused, during the interview, of signing the petition and having assisted in writing a portion of said petition. There were no advocations of violence or disobedience in the petition. The petition had been written approximately 5 months prior to its discovery by school administration.

"8

"Plaintiff was sanctioned for his participation in writing/signing the petition."

Defendants moved for summary judgment regarding plaintiff's allegations, relying, in part, on evidence that plaintiff admitted that he participated with another student (J) in drafting the petitions, admitted to authoring a document containing a number of names for the devil intended to be included with the circulation of the other petitions, admitted that he was with J when classmates were approached to sign the petitions, and admitted to personally signing the petitions. Plaintiff responded to defendants' evidence with his own affidavit, in which he averred, in part:

> "I wrote a number of synonyms or names for the devil. * * * I did not publish, post or otherwise circulate this piece of paper anywhere except with [J]. This document was included with a number of petitions drafted at least in part by [J]."

Later in his affidavit, plaintiff averred, "I did not write any petition. I 'signed' the petitions."

In other words, plaintiff effectively conceded at the time of summary judgment that he was—at least to some extent—a co-actor with J, but he claimed, nonetheless, that his actions constituted protected expression. Consequently, whatever issues of fact there are about the extent of plaintiff's involvement, it is uncontradicted that his actions went beyond expressing his personal opinion. It is also uncontradicted that the district had evidence at the time of the alleged suspension that some students and the teacher named in the petitions were affected by the petitions.[1] The police interviewed a number of students and reported to the district that there were four students interviewed who said that they were coerced by J into signing the petitions. There is also no question of fact regarding the content of the petitions that were circulated. Copies of the petitions were made part of the record, and their contents speak for themselves. Besides plaintiff's list of synonyms for the devil, the petitions, in substance, name a specific teacher, single her out, proclaim that "we will agree that she is the devil," list "all the people who hate her," and provide that those who do not sign the petitions "are subjected to be beaten till you turn blue and black."

---

[1] After the principal found the petitions in J's possession, he showed them to the teacher named in the petitions. After reading them, she left school crying.

Based on those uncontradicted facts in the summary judgment record demonstrating plaintiff's participation with J, the only remaining question is a legal one: whether the contents of the petitions, including the part authored personally by plaintiff, are protected expression in a school setting under the First Amendment. We decided a similar issue in *Pangle v. Bend-LaPine School District*, 169 Or App 376, 10 P3d 275 (2000), *rev den*, 332 Or 558 (2001), in which a school district disciplined a student for writing articles in a publication that he circulated to fellow students on his high school campus. In resolving that issue, we turned to United States Supreme Court precedent and derived from those cases the following bright-line principles. First, students do not lose their constitutional right to freedom of speech merely because they express themselves in a school environment. However, the First Amendment rights of students to express themselves in a school environment are not automatically coextensive with the rights of adults in other settings. Rather, such rights exist in light of the special characteristics of the school environment. *Tinker v. Des Moines Independent Community School Dist.*, 393 US 503, 506, 89 S Ct 733, 21 L Ed 2d 731 (1969). Thus, it follows that students cannot be "punished merely for expressing their personal views on the school premises * * * unless school authorities have reason to believe that such expression will 'substantially interfere with the work of the school or impinge upon the rights of other students.' " *Hazelwood School District v. Kuhlmeier*, 484 US 260, 266, 108 S Ct 562, 98 L Ed 2d 592 (1988) (quoting *Tinker*, 393 US at 509). On the other hand, "[a] school need not tolerate student speech that is inconsistent with its basic educational mission, even though the government could not censor similar speech outside the school." *Id.* (internal quotation marks and citation omitted).

When the same principles are applied to this case, it becomes clear that plaintiff's expression, made in a school environment, was not protected expression under the First Amendment. The test is one of the objective reasonableness of the school district's disciplinary action. Framed properly, the question is whether the school district had reason to believe, based on the information in its possession at the time

that it took its action, that plaintiff's expression in conjunction with that of his coactor disrupted or potentially could have disrupted the middle school's educational mission for its students. With that focus in mind, the most obvious characteristic of plaintiff's expression was that it went beyond the expression of plaintiff's personal opinion about his teacher on school grounds. Rather, the district could reasonably believe that plaintiff's expression was aimed at encouraging other students to express hatred for an authority figure in the school and to declare her to be the "devil." The petitions informed other students that they could suffer the consequence of being "beaten till you turn blue and black" in the event of their failure to sign the petitions.[2] Whether the petitions were intended to be a joke, as plaintiff later claimed, or were intended to promote verbal abuse and disrespect for their teacher, the potential disruptive effect of plaintiff's expression on the school's educational mission is the same.[3] Based on the information that it had at the time, the school district had reason to be believe that plaintiff's expression could substantially interfere with the work of the school and impinge upon the rights of other students to be free from disruptive influences on their own academic pursuits.[4] It follows that the trial court correctly granted summary judgment on plaintiff's section 1983 claim, as well as on his other claims.

Apparently, the majority and I arrive at different legal conclusions because we apply different standards of review to the contents of the summary judgment record. The majority sifts through the summary judgment record with lawyer-like deftness and seizes on issues of fact, that in its

---

[2] Plaintiff was asked during his deposition whether he was trying to redress a grievance with his teacher by participating in the preparation and circulation of the petitions. He answered, " I don't believe so." He was also asked if he was trying to effect some change in school policy by his actions by signing the petitions. He responded, "I don't believe so."

[3] It is not necessary that expression be defamatory, threatening, obscene, or provocative for it to interfere with the educational mission of a school environment. For instance, the inoffensive "passing of notes" among students in a middle school classroom during class is the kind of expression that could reasonably be potentially disruptive to an environment meant to be conducive to learning and therefore constitutionally subject to discipline under the applicable law.

[4] At a minimum, plaintiff's expression aided in the disruption of the school's educational mission for J.

view, create jury questions and therefore preclude summary judgment. Those issues of fact cause it to conclude that the record is unclear about "the speech that defendant reacted to." 198 Or App at 521. It explains, "Put another way, a finder of fact could conclude that, at the time defendant suspended plaintiff, defendant knew only that plaintiff had provided the petition's author with an unused and undisclosed list of synonyms for the word 'devil.' " 198 Or App at 522.

As a matter of law, there are at least two layers of standards of review that must be applied in this case. The first layer concerns a substantive rule of law and focuses on the information available to the district at the time it made its alleged decision to suspend plaintiff. The question is not what a factfinder could find at trial was plaintiff's actual involvement, but whether there was information reported to the school district at the time that could lead it to reasonably believe that plaintiff was involved with J in the reported misconduct. Plaintiff does not contest that the district received a police report before it allegedly suspended plaintiff that memorialized an investigation about whether students had been coerced into signing petitions calling for the removal of the school principal and a teacher. According to the report, during a meeting with "the involved students," "it was learned [J] and plaintiff were the two that created the documents" and that "[b]oth boys stated that they meant no harm in the petitions." Plaintiff was also interviewed and made the following statements to the police investigator:

"[J] wrote all the documents.

"I helped [J] with them.

"[J] wrote them though, I did not.

"I wrote the Devil names."

The police report also related a conversation that occurred with plaintiff when his father was present. According to the report, "[plaintiff] stated he was present when [J] wrote the petitions, but did not participate in the writing of them. [Plaintiff] stated that J was behind all of this."

In addition to the information in the police report, the trial court had before it the evidence from the affidavits of

the parties, which purported to frame contested and uncontested issues of fact. Plaintiff's affidavit filed in the summary judgment proceeding did not controvert the statements in the district's affidavit that he participated with J in drafting the petitions, that the list of the names for the devil was intended to be included in the circulation of the petitions to other students, that he signed the petitions himself, and that he was with J when they solicited classmates to sign the petitions. Rather, he said that he "did not publish, post or otherwise circulate this piece of paper [the list of names for the devil] anywhere *except with* [J]." (Emphasis added.) He also admitted in his affidavit that the list he wrote "was included with a number of petitions drafted at least in part by [J]," and he reiterated his position that he did not write the petitions.

ORCP 47 C is the governing procedural rule of law in this case, and thus provides another layer of review. It operates by precluding summary judgment when there exist genuine issues of material fact, providing, in part, that "[n]o genuine issue as to a material fact exists if, based upon the record before the court viewed in a manner most favorable to the adverse party, no objectively reasonable juror could return a verdict for the adverse party on the matter that is the subject of the motion for summary judgment." Thus, under the rule, plaintiff's concessions as to the extent of his participation with J are viewed in the manner most favorable to him. But even so, his concessions amount to admitted participation with J in the preparation and circulation of petitions, including the list that he personally prepared. No reasonable factfinder could find otherwise on this record. In that light, the legal question whether the district had reason to believe at the time that it disciplined plaintiff that his expression had interfered with, or could have substantially interfered with, the educational mission of the school or had impinged or could have impinged on the rights of other students is easily answered. In sum, the factual disputes plucked from the record by the majority do not create a genuine issue of material fact because of plaintiff's concessions regarding his participation with J.

I dissent.