[No. S127641. Mar. 9, 2006.]

STEVEN FRYE, Plaintiff and Appellant, v.
TENDERLOIN HOUSING CLINIC, INC., Defendant and Respondent.

## Counsel

Law Offices of Andrew M. Zacks, Law Offices of Paul F. Utrecht, Zacks Utrecht & Leadbetter, Andrew M. Sacks, Paul F. Utrecht and James B. Kraus for Plaintiff and Appellant.

Chapman, Popik & White, Susan M. Popik, Kyle D. Kickhaefer, Benjamin J. Riley; Tenderloin Housing Clinic and Stephen L. Collier for Defendant and Respondent.

Heller Ehrman, Steven V. Bromse, Warrington S. Parker III, Ethan C. Glass; The Impact Fund, Brad Seligman and Sarah Varela for the American Civil Liberties Union Foundation of Northern California, the American Civil Liberties Union Foundation of Southern California, the American Civil Liberties Union Foundation of San Diego and Imperial Counties, The Impact Fund, Natural Resources Defense Council, the Center for Biological Diversity, the Center on Race, Poverty & the Environment, Disability Rights Advocates, the Environmental Defense Center, the Utility Reform Network, Equal Rights Advocates, Electronic Frontier Foundation and Charles D. Weisselberg as Amici Curiae on behalf of Defendant and Respondent.

Western Center on Law and Poverty, Richard A. Rothschild; Latham & Watkins, Amos E. Hartson, Kathryn M. Davis, Beth A. Collins, Keith Wesley; Greines, Martin, Stein & Richland and Robin Meadow for the Los Angeles County Bar Association as Amicus Curiae on behalf of Defendant and Respondent.

Carroll, Burdick & McDonough and Don Willenburg for Eviction Defense Collaborative, Inc., as Amicus Curiae on behalf of Defendant and Respondent.

Anthony T. Caso for Pacific Legal Foundation as Amicus Curiae on behalf of Defendant and Respondent.

Legal Services of Northern California, Gary F. Smith; Western Center on Law and Poverty, Richard A. Rothschild; and Julia R. Wilson for Legal Aid Association of California as Amicus Curiae on behalf of Defendant and Respondent.

Marie M. Moffat, Lawrence C. Yee, Karen Segar Salty and Rachel S. Grunberg for the State Bar of California as Amicus Curiae.

OPINION

**GEORGE, C. J.**—The present case concerns the authority of nonprofit corporations to practice law. The Court of Appeal held that Corporations Code section 13406, subdivision (b) (section 13406(b)) provides the sole authority under which a nonprofit public benefit corporation is authorized to practice and that, in failing to comply with section 13406(b), defendant Tenderloin Housing Clinic, Inc. (THC), engaged in the unauthorized practice of law.[1] In a significant and unusual instance of unanimity across the political spectrum, THC, joined by organizations as diverse as the Pacific Legal Foundation and the American Civil Liberties Union as amici curiae, urges that we reverse the judgment of the Court of Appeal.

Reviewing the background of the doctrine prohibiting the corporate practice of law, the exceptions to this doctrine that developed prior to the enactment of section 13406(b), the constitutional problems that would be created by the Court of Appeal's interpretation of the statute, and the text and legislative history of the measure, we conclude that section 13406(b) does not occupy the entire field of law governing the corporate practice of law by nonprofit corporations.

The question remains under what authority THC practiced law. THC claims it is authorized to practice law pursuant to an exception to the common law rule against corporate practice of law. THC relies upon United States Supreme Court authority recognizing that First Amendment principles restrict the ability of the state to limit the associative and expressive rights of advocacy groups to employ litigation to further their goals. The Court of Appeal, reaching the issue in the context of THC's claim that section 13406(b) could not be applied retroactively, disagreed with THC's claim that it was authorized to practice law pursuant to this exception, holding that THC failed to establish that its activities warranted protection under the First Amendment of the United States Constitution.

Although the Court of Appeal viewed the applicable constitutional doctrine too narrowly, because of the procedural posture of the case we do not reach a final conclusion respecting the nature of THC's activities or its claim that it enjoyed a right to practice law that is protected by the Constitution. Although we could order a remand for further proceedings in this litigation, which already has consumed many years, we decline to do so, because we agree with the trial court that plaintiff, Roy M. Frye, was not entitled to the remedy he sought.

---

[1] Statutory references are to the Corporations Code unless otherwise indicated.

## I

THC was incorporated in 1980 pursuant to the Nonprofit Public Benefit Corporation Law. (§ 5110 et seq.) According to its articles of incorporation, it was incorporated for "public and charitable purposes" and apparently enjoys tax-exempt status pursuant to section 501(c) of the Internal Revenue Code (26 U.S.C.). The articles of incorporation stated that THC's purpose was "to provide housing law education and information to low-income tenants in San Francisco, CA." The bylaws added to that purpose "the preservation of the Tenderloin community as a residential neighborhood, the preservation and improvement of housing, particularly residential hotels, assisting tenants to assert their legal rights, using legal skills as necessary to serve the low and moderate income residents of the Tenderloin community."

THC's bylaws directed that a majority of the directors of the corporation should reside in or have familiarity with issues in the Tenderloin neighborhood and that the board of directors should reflect the neighborhood's diverse population.

THC employed several attorneys, all of whom were active members of the State Bar of California. The attorneys represented tenants in administrative and court proceedings and were required to convey to THC any legal fees they received in the course of providing such representation.

The record does not detail THC's activities over the entire period of the present litigation, but does indicate that THC undertook a number of responsibilities in addition to representing clients in litigation. According to a THC attorney, THC provided various services for homeless persons and, beginning in 1993, its nonlegal services constituted more than 50 percent of its activities. For the 1996 tax year, THC received substantial government funding for providing housing and other general social services such as counseling involving substance abuse and employment for persons of limited means. In a contract entered into with the City and County of San Francisco (the City) for the period July 1, 1998 to June 30, 2000, THC agreed to provide "comprehensive housing services for the homeless and other low-income adults." It appears THC administered an element of the City's housing program for homeless persons, assigning needy persons to shelters as they became available and offering other social services.

In April 1993, THC entered into a retainer agreement with Roy M. Frye[2] and several other tenants of a residential hotel in the Tenderloin neighborhood

---

[2] Roy M. Frye died on August 22, 2001. His son, Steven Frye, was substituted as his successor in interest and was designated as plaintiff in this action on November 6, 2002.

of San Francisco for THC to represent the tenants in an action against their landlords alleging defective conditions at the hotel. The agreement contained the following language concerning attorney fees: "A client shall pay the attorney, as attorney[] fee[s] for such representation, thirty-three and one-third percent (33-1/3%) of any settlement reached prior to the original date set for trial in the matter, or forty percent (40%) of any recovery by settlement or trial judgment achieved on or after the original date set for trial. . . . [¶] . . . [¶] If the Clinic's work results in the client or the Clinic being awarded attorneys fees either by statute or by a provision in a rental agreement, the Clinic shall recover whatever amount is greater between the attorneys fee award and the amount of the contingency fee." THC Attorney Stephen Collier and Frye both signed the agreement.

In May 1993, Collier filed a complaint on behalf of Frye and 14 other tenants. (*Frye et al. v. Skyline Realty et al.* (Super. Ct. S.F. City and County, 1994, No. 952016).) At various times during the pendency of the action, Collier and other THC attorneys appeared on behalf of Frye and the other tenants.

After a one-month trial in May 1994, the jury awarded the 15 tenants $239,005 in damages. Of this amount, $10,355 was awarded to Frye. By stipulation, the court deducted amounts that the San Francisco Rent Board previously had awarded, reducing the total award to $236,943.85 and Frye's award to $10,242.50. The landlords subsequently appealed from the judgment, which was affirmed in its entirety, and the landlords' petition for review was denied by this court.

The tenants petitioned for attorney fees and costs, relying upon Civil Code section 1942.4 and the attorney-fee provisions in nine of the 15 pertinent rental agreements.[3]

The trial court awarded attorney fees in the amount of $96,000 for services provided at the trial and $35,560 for the appeal, for a total of $131,560. The court also awarded costs of $10,164.45 through trial and $332.88 for the appeal. In December 1996, the landlords paid a total of $464,723.33 to satisfy the judgment, consisting of $296,179.45 in damages plus interest and $168,543.88 in attorney fees and costs plus interest. Defendants satisfied the judgment by issuing checks made payable to THC and to each plaintiff tenant. Frye's check was made out in the amount of $12,803. THC deposited all of the checks and deducted costs in the amount of $10,497.33 and attorney fees in the amount of $185,889.33, the latter figure representing its contingency fee of 40 percent of the total judgment of $464,723.33, because 40

---

[3] Civil Code section 1942.4, subdivision (b)(2) provides that the prevailing party in cases involving substandard dwellings is entitled to reasonable attorney fees and costs.

percent of the total award, including attorney fees, costs, and interest, proved to be greater than the award of statutory attorney fees plus interest ($168,543.88).

THC retained $1,203.96 from Frye's share of the damages award to satisfy the balance of attorney fees he owed under the contingency agreement and remitted $11,599.04 to Frye. Shortly thereafter, Frye demanded an accounting. Collier provided Frye with a detailed explanation of THC's calculations in distributing the judgment award.

In January 1998, Frye filed the present action against THC, alleging five causes of action: (1) money had and received; (2) fraud and negligent misrepresentation; (3) breach of fiduciary duty; (4) breach of contract; and (5) unfair business practices.

In his first cause of action, for money had and received, Frye alleged that THC was not licensed to practice law in California or to represent the plaintiff tenants in the underlying action, with the result that the contract between THC and Frye was void, and therefore that THC was not entitled to retain attorney fees or costs. Frye alleged that the reasonable value of THC's services was zero. In his second cause of action, for fraud and negligent misrepresentation, Frye alleged that THC falsely represented that it would provide free legal services, that it was licensed to practice law and was authorized to enter into contracts for legal services, and that it had authority to charge attorney fees. Frye claimed that he relied on these representations, and that had they not been made, Frye would not have paid THC attorney fees and costs. In his third cause of action, for breach of fiduciary duty, Frye alleged that the nature of the underlying action "did not justify the amounts collected by [THC]" and that the amounts collected were "unreasonable, used an impermissible compounding of fees, and were in violation of defendant's fiduciary duty to plaintiff[]." In his fourth cause of action, for breach of contract, plaintiff alleged that THC retained attorney fees in excess of the amount allowable under the agreement. In his fifth cause of action, Frye alleged THC engaged in a pattern and practice of unfair and illegal practices in violation of the Business and Professions Code, damaging both Frye and the public. Frye claimed that THC was not entitled to receive or retain unlawful fees and costs it collected during the litigation. Frye's prayer for relief sought the return of a specified amount of fees and costs from THC and disgorgement of "all of [THC's] unlawfully collected fees and costs and . . . restitution to each member of the general public who has paid unlawful fees and costs," along with statutory and punitive damages and an injunction against further unfair business practices.

In February 1998, THC moved for summary judgment or, in the alternative, summary adjudication of each cause of action. In April 1998, the trial court (David A. Garcia, Judge) denied the motion as to the first, third, fourth, and fifth causes of action, finding that triable issues of material fact remained concerning the "amount of fees due under the contract." The trial court granted THC's motion as to the second cause of action for fraud and negligent misrepresentation, determining that no remaining triable issues of material fact remained, and explaining that, contrary to Frye's claim, nonprofit corporations are not required to register as professional law corporations. Accordingly, the trial court concluded, THC had not "expressly or impliedly misrepresented its authority to provide legal services or to recover attorney[] fees and costs" and had not committed fraud as a matter of law.

In June 1998, Frye entered into a stipulation with THC to settle his fourth and fifth causes of action (for breach of contract and unfair business practices) for $1,390.06, an amount representing the contingency fee that THC had deducted from Frye's award, plus interest. The parties stipulated that the court (Thomas J. Mellon, Judge) would determine certain issues raised by the pleadings on the remaining causes of action for money had and received and breach of fiduciary duty, and that the matter would be tried to the court rather than before a jury.

In September 1998, the parties stipulated to provide supplemental briefing with respect to various legal issues raised by the pleadings, including (despite the earlier disposition by Judge Garcia) whether THC was required to register with the State Bar as a professional law corporation, whether THC was required to disgorge fees to Frye, whether THC was entitled to fees in quantum meruit, whether individual THC attorneys were indispensable parties, and whether further discovery was required.

In December 1998, four employees of THC, including Stephen L. Collier, moved to intervene on the basis that they were entitled to attorney fees even if THC was not entitled to them. The court granted the motion, and a complaint in intervention was filed.

In October 1999, Frye requested that the trial court issue a statement of decision on certain issues identified in the earlier stipulation. In December 1999, the trial court (Judge Mellon) filed a notice of intended decision. The trial court concluded that the relevant statutes did not require *every* nonprofit corporation or legal services project that employs attorneys practicing law on behalf of clients of the corporation to register with the State Bar. The court, however, was unable to determine, based solely upon the pleadings, whether the nature of THC's activities required that it register, or whether the agreement was unenforceable. The court pointed out that, by virtue of the First

Amendment of the United States Constitution, organizations such as THC might be exempt from statutes requiring registration but that the record at the pleading stage was not adequate to determine whether THC was entitled to such an exemption. The court also tentatively ruled that Frye's contract was with THC rather than with the individual attorneys employed by THC, that the attorney-fee award granted fees to Frye, but that THC might have a claim in quantum meruit.

In October 2001, following limited discovery, THC and the interveners filed a notice of motion and motion for reconsideration of the trial court's decision that the attorney fees had been awarded to Frye rather than THC, and for judgment on the pleadings on Frye's two remaining causes of action for money had and received and for breach of fiduciary duty. THC and the interveners contended this court's decision in *Flannery v. Prentice* (2001) 26 Cal.4th 572, 575 [110 Cal.Rptr.2d 809, 28 P.3d 860] (*Flannery*)[4] established that the attorney fees belonged to THC, thereby entitling THC to judgment on the pleadings, because THC owed no debt to Frye and was under no fiduciary duty to convey the attorney fees to Frye.

In February 2002, the trial court granted the motion to reconsider, but denied the motion for judgment on the pleadings on the ground that it believed the *Flannery* decision should not apply retroactively.

In April 2003, THC moved again for judgment on the pleadings as to Frye's two remaining causes of actions (for money had and received, and breach of fiduciary duty) in light of the Court of Appeal's decision in *Olson v. Cohen* (2003) 106 Cal.App.4th 1209 [131 Cal.Rptr.2d 620] (*Olson*). That case held that the plaintiff client was not injured by the failure of a for-profit law corporation to register with the State Bar and was not equitably entitled to disgorgement of fees. (*Olson, supra,* 106 Cal.App.4th at p. 1211.)

In June 2003, the trial court granted THC's motion for judgment on the pleadings, concluding that, even assuming without deciding that evidence regarding THC's activities would establish that it was required to register with the State Bar as a professional law corporation, Frye was not entitled to any remedy. The trial court held that the *Olson* decision disposed of Frye's disgorgement claim. The court entered judgment in favor of THC and ordered the interveners' complaint dismissed as moot.

On appeal from the judgment, Frye contended that the first trial court erred in granting summary adjudication of his second cause of action for fraud and

---

[4] In *Flannery, supra,* 26 Cal.4th 572, 575, we held that statutory attorney fees awarded in an action brought pursuant to the California Fair Employment and Housing Act belong to the attorneys whose labor earned them the fees, absent an enforceable agreement to the contrary.

negligent misrepresentation, because "THC represented to Frye that it was an attorney but was actually not licensed with the State Bar or otherwise entitled to practice law." Frye further contended that the second trial court erred in granting judgment on the pleadings as to the remaining two causes of action, because THC "is not authorized to practice law, entered into an illegal agreement with . . . Frye, and retained money to which i[t] was not entitled."

In July 2004, the Court of Appeal reversed in part and affirmed in part the rulings of the trial court. The appellate court affirmed the order granting summary adjudication as to the second cause of action for fraud and misrepresentation, determining that, although the trial court erred in deciding that THC was not under any obligation to register with the State Bar as a professional law corporation, plaintiff suffered no damages. The Court of Appeal reversed, however, the trial court's order granting judgment on the pleadings as to the causes of action for money had and received, and breach of fiduciary duty. The court concluded that THC had a duty to register with the State Bar and otherwise to comply with the provisions of section 13406(b) and that THC's refusal to do so necessitated disgorgement of the statutory attorney fees awarded in the underlying action. The court also remanded the matter to the trial court to determine "whether and in what amounts Frye or the individual attorneys should be entitled to the awarded fees."

This court granted THC's petition for review. Numerous organizations, including the Pacific Legal Foundation and the Los Angeles County Bar Association—all told representing more than 70 nonprofit organizations— have filed amicus curiae briefs contending that section 13406(b) does not apply to organizations such as THC and that such organizations cannot serve in their present form if they are required to conform to the requirements of that statute. The State Bar filed an amicus curiae brief asserting that it never has required organizations such as THC to register and to comply with section 13406(b), and that only five of the hundreds of nonprofit corporations that offer legal services to third parties in this state have registered and organized themselves pursuant to the statute.

## II

### A

Section 13406(b), which was added to the Moscone-Knox Professional Corporation Act (§ 13400 et seq. (Professional Corporation Act)) in 1993,

provides in pertinent part: "A professional law corporation[5] may be incorporated as a nonprofit public benefit corporation under the Nonprofit Public Benefit Corporation Law under either of the following circumstances: [¶] (1) The corporation is a qualified legal services project or a qualified support center within the meaning of subdivisions (a) and (b) of Section 6213 of the Business and Professions Code. [¶] (2) The professional law corporation otherwise meets all of the requirements and complies with all of the provisions of the Nonprofit Public Benefit Corporation Law, as well as all of the following requirements: [¶] (A) All of the members of the corporation, if it is a membership organization as described in the Nonprofit Corporation Law, are persons licensed to practice law in California. [¶] (B) All of the members of the professional law corporation's board of directors are persons licensed to practice law in California. [¶] (C) Seventy percent of the clients to whom the corporation provides legal services are lower income persons . . . and . . . other persons who would not otherwise have access to legal services. [¶] (D) The corporation shall not enter into contingency fee contracts with clients." This subdivision was added to the Professional Corporation Act by an amendment that became effective in 1994. (Stats. 1993, ch. 955, § 7.5, pp. 5499–5500.)

■ Related statutes require professional law corporations organized for profit and those organized pursuant to section 13406(b) to register with the State Bar of California. (§ 13401, subd (b); Bus. & Prof. Code, § 6160.) All directors, shareholders, and officers must be licensed to practice law. (Bus. & Prof. Code, § 6165.) Registration permits the State Bar to enforce the statutory conditions on the practice of law that apply to for-profit law corporations and also permits the State Bar to enforce section 13406(b).[6]

■ In essence, section 13406(b) provides that a professional law corporation may be organized as a nonprofit public benefit corporation if it falls within either of two categories: (1) it is a qualified legal services project or a qualified support center as defined by statute—essentially, a legal aid program—or (2) all of its members and directors are licensed attorneys; 70 percent of its clients are lower income individuals or "other persons who would not otherwise have access to legal services"; and it refrains from

---

[5] Under the Professional Corporation Act, a professional corporation is an entity "organized under the General Corporation Law or pursuant to subdivision (b) section 13406 that is engaged in rendering professional services in a single profession . . . pursuant to a certificate of registration issued by the governmental agency regulating the profession . . . ." (§ 13401, subd. (b) [also establishing exceptions to the registration requirement that are inapplicable to the legal profession].)

[6] As a condition of registration, the State Bar requires the applicant to demonstrate that each shareholder, director, and officer of the corporation is licensed to practice law and that the corporation maintains security for claims against it for errors and omissions. (State Bar Law Corp. Rules, rule IV.) In addition, when the applicant law corporation is a nonprofit public benefit corporation, the conditions of registration include those set out in section 13406(b). (State Bar Law Corp. Rules, rule IV.)

entering into contingency fee agreements. THC evidently did not fall within either exception while it was representing Frye. It did not register with the State Bar as a professional corporation pursuant to Business and Professions Code section 6160 and, contrary to section 13406(b), its board and membership included nonlawyers; it did not at all times have a policy restricting its practice primarily to low-income persons; and it entered into contingent fee agreements.

## B

The Court of Appeal began its analysis with the premise that corporations ordinarily are not permitted to practice law. The appellate court stated its belief that, until section 13406(b) was enacted, the *sole* statute permitting the corporate practice of law was the Professional Corporation Act, which authorized for-profit corporations to practice law under certain restrictions. (§ 13400 et seq., added by Stats. 1968, ch. 1375, § 9, p. 2704.) The court concluded that although the 1993 amendments adding section 13406(b) to the Professional Corporation Act granted nonprofit corporations statutory authority to practice law, the authority of nonprofit corporations in general to practice law necessarily was circumscribed by the conditions set forth in section 13406(b). In essence, the Court of Appeal held that this statute occupies the entire field of law governing the authority of nonprofit corporations to practice law.

The Court of Appeal summarily rejected the contention that the conditions set out in section 13406(b) are permissive. "The only thing 'permissive' about section 13406, subdivision (b) is that a corporation practicing law may be incorporated as a for-profit or a nonprofit corporation, provided that it complies with code requirements pertaining to each. Either way, however, registration is required." The Court of Appeal concluded that, because THC chose to practice law as a nonprofit corporation, in order to be authorized to practice law it not only would be required to register with the State Bar pursuant to Business and Professions Code section 6160, but it also would be subject to the other limitations imposed by section 13406(b).

THC contended on appeal that section 13406(b), which became effective in 1994, did not apply retroactively to the retainer agreement it entered into with Frye in 1993. The Court of Appeal disagreed. On the one hand, as we have seen, that court treated section 13406(b) as the sole source of authority under which a nonprofit corporation may practice law. On the other hand, responding to THC's retroactivity claim, the court seemed to acknowledge that, in some

instances prior to the enactment of section 13406(b), a corporation could enjoy protection under the First Amendment from state regulation that impaired the ability of the organization to practice law. The Court of Appeal concluded, however, that THC had failed to *prove* that its activities and purpose in practicing law invoked the protection of the First Amendment.

## C

We now consider the Court of Appeal's conclusion that section 13406(b) serves as the sole source of authority under which a nonprofit corporation may practice law. We conclude, for the reasons that follow, that the Court of Appeal's reasoning on this point is flawed, largely because that court failed to take into account the history of the rule against corporate practice of law and the absence of any evidence that the Legislature intended to overturn preexisting authority permitting legal aid, mutual benefit, and advocacy groups to practice law in the corporate form.

Historically, judicial decisions in California and most other states proscribed the corporate practice of law. (*People v. Merchants Protective Corp.* (1922) 189 Cal. 531, 537–538 [209 P. 363] (*Merchants Protective Corp.*); *In re Co-operative Law Co.* (1910) 198 N.Y. 479 [92 N.E. 15]; Giesel, *Corporations Practicing Law Through Lawyers: Why the Unauthorized Practice of Law Doctrine Should Not Apply* (2000) 65 Mo. L.Rev. 151, 172 (Giesel).) In the exercise of their authority to regulate the practice of law, courts concluded the interests of clients required that corporations not be authorized to practice law themselves *or* hire attorneys for the purpose of representing third parties. (See *Merchants Protective Corp., supra,* 189 Cal. at pp. 538–539; see also *In re Attorney Discipline System* (1998) 19 Cal.4th 582, 592–593 [79 Cal.Rptr.2d 836, 967 P.2d 49] [regulation of the practice of law constitutes a core judicial function].)

This court set forth the proscription on the corporate practice of law in a decision relying upon our inherent authority to regulate the practice of law. (*Merchants Protective Corp., supra,* 189 Cal. at pp. 537–538, 540.) In that case, the Attorney General challenged the authority to practice law of an incorporated trade association that employed attorneys to represent its members. We held that the corporation was engaged in the unauthorized practice of law and that a corporation could neither practice law nor employ lawyers to represent third parties. (*Ibid.*; see also *Hildebrand v. State Bar* (1950) 36 Cal.2d 504, 509–510 [225 P.2d 508].)

We reasoned that the profit motive created an inherent conflict of interest for attorneys and would foster inappropriate commercialization of the profession. (*Merchants Protective Corp., supra,* 189 Cal. at p. 539.) It was this

court's view that the corporate practice of law posed the risk that the corporation, potentially governed by persons not versed in or bound by lawyers' ethical obligations and the duty of undivided loyalty owed by an attorney to his or her client, would seek to advance its own commercial interest at the expense of the interests of clients. (*Id.* at pp. 538–539.) "The essential relation of trust and confidence between attorney and client cannot be said to arise where the attorney is employed, not by the client, but by some corporation which has undertaken to furnish its members with legal advice, counsel and professional services. The attorney in such a case owes his first allegiance to his immediate employer, the corporation, and owes, at most, but an incidental, secondary and divided loyalty to the clientele of the corporation." (*Ibid.*)

We also were concerned that clients would possess few remedies against a law corporation for malpractice committed by the corporation's attorneys, because " '[t]here would be no remedy by attachment or disbarment to protect the public from imposition or fraud, no stimulus to good conduct from the traditions of an ancient and honorable profession, and no guide except the sordid purpose to earn money for stockholders. The bar, which is an institution of the highest usefulness and standing, would be degraded if even its humblest member became subject to the orders of a money-making corporation engaged not in conducting litigation for itself, but in the business of conducting litigation for others.' " (*Merchants Protective Corp., supra,* 189 Cal. at p. 539.)

Notwithstanding the foregoing historical rule, a number of sources provided for exceptions to the rule. First, legislation was enacted that eroded the broad rule against the corporate practice of law and the practice of other professions. As noted, the Professional Corporation Act (§ 13400 et seq.) permits the corporate practice of law even *for profit,* subject to various restrictions that are intended to safeguard client interests against the profit motive, including registration with the State Bar and a requirement of corporate ownership and governance solely by attorneys. (See, e.g., §§ 13401, subd. (b), 13404; Bus. & Prof. Code, §§ 6160, 6165.) In addition, group legal services plans—whose function is substantially similar to that of the corporation in the *Merchants Protective Corp.* case—have been authorized to operate as nonprofit corporations (§ 10830; see also § 7110 et seq.). So have lawyer referral services. (Bus. & Prof. Code, § 6155.)

Even more significantly, the traditional judicial rule against the corporate practice of law has been subject to judicial exceptions for nonprofit corporate practice that developed both prior to and subsequent to the enactment of the Professional Corporation Act. Under the authority of this case law, legal aid, mutual benefit, and advocacy groups have practiced law in the

corporate form, and we find no indication that the Legislature intended to abrogate or challenge these decisions when it enacted section 13406(b).

In order to supply a reasonable solution to the continuing problem of access to justice for the poor and the economically disadvantaged, legal aid societies have been permitted to practice in a nonprofit corporate form. Courts have accepted the premises that legal aid societies serve an important public interest, and that the nonprofit nature of the enterprise reduces or eliminates the risk that the entity will compromise the loyalty of attorney-employees to clients or otherwise threaten clients' interests. (See *Azzarello v. Aid Society* (1962) 117 OhioApp. 471 [90 OhioLawAbs. 564, 185 N.E.2d 566, 570]; *Touchy v. Houston Legal Foundation* (1968) 432 S.W.2d 690, 694–695 [11 Tex. Sup. Ct. J. 477]; Annot., Restrictions on Right of Legal Services Corporation or "Public Interest" Law Firm to Practice (1983) 26 A.L.R.4th 614, 615 ["Many jurisdictions . . . have carved out an exception to that rule [barring corporate practice of law] for benevolent or charitable organizations, in order to facilitate the activities of public interest law firms, legal aid societies, and the like"].)

A 1972 opinion of the California Attorney General, citing *Azzarello v. Legal Aid Society of Cleveland, supra,* 185 N.E.2d 566, and other out-of-state decisions, explained that the general rule against corporate practice of law does not extend to legal aid societies in this state, principally because of the public policy that supports efforts to provide access to justice for all members of society. "[T]he operation of these and similar nonprofit charitable societies has been the subject of judicial recognition and rests upon sound policy objectives" (55 Ops.Cal.Atty.Gen. 39, 43–44 (1972)), including the important goal of ensuring that persons of limited means retain access to the courts, a value that outweighs concerns about potential conflicts of interest. (*Id.* at pp. 42–44; see also State Bar Com. On Prof. Responsibility, Formal Opn. No. 1981-64 (1981) p. 3, fn. *, reprinted in 1 Cal. Compendium on Prof. Responsibility, State Bar Formal Opn. No. 1981-64, p. IIA-182 [observing that legal aid organizations are authorized to practice as nonprofit corporations in California].)

██ Case law provides another exception to the rule against corporate practice of law that is of particular relevance for nonprofit organizations such as THC. The First Amendment protects the associational and expressive rights of persons—both lawyers and nonlawyers—to join together to employ litigation to seek redress of grievances. (*NAACP v. Button* (1963) 371 U.S. 415, 428-431 [9 L.Ed.2d 405, 83 S.Ct. 328].) In *NAACP v. Button,* statutes that would have prohibited NAACP attorneys and lay members or supporters of the NAACP from urging others to join them in undertaking litigation challenging discriminatory practices impermissibly "broadly curtail[ed] group

activity leading to litigation" (*id*. at p. 436), and threatened to "smother[] all discussion" by NAACP lawyers, members, or supporters "looking to the eventual institution of litigation on behalf of the rights of members of an unpopular minority." (*Id*. at p. 434.) The NAACP demonstrated that the state rules infringed upon the fundamental First Amendment rights of its lawyers, members, and supporters, while the state failed to demonstrate a compelling state interest in its rules. (*Id*. at pp. 438–439.)

In a discussion that is relevant to the general rule prohibiting corporate practice of law, the state evidently pointed to the danger that the NAACP as a "lay intermediary" might "control litigation or otherwise interfere with the rendering of legal services." (*NAACP v. Button, supra*, 371 U.S. at p. 441.) The court, however, determined that there had been no showing that such a conflict existed. Although the state interest in regulating the practice of law may justify limiting the extent to which laypersons may interfere in the day to day conduct of litigation (*In re Primus* (1978) 436 U.S. 412, 439 [56 L.Ed.2d 417, 98 S.Ct. 1893]; *NAACP v. Button, supra*, 371 U.S. at p. 447 (conc. & dis. opn. of White, J.)), the state's interest ordinarily does not justify preventing persons from joining together to employ litigation to achieve the organization's goals. "This is so partly because no monetary stakes are involved, and so there is no danger that the attorney will desert or subvert the paramount interest of his client to enrich himself or an outside sponsor. And the aims and interests of NAACP have not been shown to conflict with those of its members and nonmember . . . litigants . . . ." (*NAACP v. Button, supra*, 371 U.S. at p. 443.)[7]

The broad import of the high court cases is to "uphold[] the First Amendment principle that groups can unite to assert their legal rights as effectively and economically as practicable." (*United Transportation Union v. Michigan Bar* (1971) 401 U.S. 576, 580 [28 L.Ed.2d 339, 91 S.Ct. 1076].) The high court observed that rules against solicitation of clients and the unauthorized practice of law traditionally were directed against conduct involving some element of malicious intent, which the court found absent from the activities of organizations exercising "First Amendment rights to enforce constitutional rights through litigation." (*NAACP v. Button, supra*, 371 U.S. at p. 440.) In addition, regulations intended to prevent attorneys from "stirring up litigation" ordinarily are "aimed chiefly at those who urge recourse

---

[7] See also *In re Primus, supra*, 436 U.S. at pages 426, 429–431 (overturning discipline of an attorney who advised third parties who had been sterilized that their rights may have been violated and who offered representation by the ACLU free of charge); American Bar Association Committee on Ethics and Professional Responsibility, Formal Opinion No. 93-374 (1993), reprinted in American Bar Association Lawyers Manual on Professional Conduct (Bur. Nat. Affairs 1991–1995) pages 1001:183 through 1001:187 ("it is now well settled, as a matter of constitutional law, that non-profit organizations may employ staff attorneys to provide legal representation to appropriate categories of third persons").

to the courts for private gain, serving no public interest." (*Ibid.*) Finally, "[o]bjection to the intervention of a lay intermediary, who may control litigation or otherwise interfere with the rendering of legal services in a confidential relationship, also derives from the element of pecuniary gain." (*Id.* at p. 441.) By contrast, "[r]esort to the courts to seek vindication of constitutional rights is a different matter from the oppressive, malicious, or avaricious use of the legal process for purely private gain" (*id.* at p. 443) and, moreover, the state made no showing of "substantive evils flowing from [NAACP's] activities [that warrant] the broad prohibition which it has imposed." (*Id.* at p. 444; see also *Mine Workers v. Illinois Bar Assn.* (1967) 389 U.S. 217, 221, 225 [19 L.Ed.2d 426, 88 S.Ct 353] (*Mine Workers*) [rejecting the claim that the holding of *NAACP v. Button* is restricted to politically motivated advocacy]; see also *United Transportation Union, supra,* 401 U.S. at pp. 585–586; *Railroad Trainmen v. Virginia Bar* (1964) 377 U.S. 1, 7, 8, & fn. 10, [12 L.Ed.2d 89, 84 S.Ct. 1113, 94 OhioLawAbs. 33].)

The Supreme Court also rejected the view that the potential award of statutory attorney fees to the nonprofit organization would endow the organization with a pecuniary motive likely to cause a conflict of interest. (*In re Primus, supra,* 436 U.S. at pp. 430–431; see also ABA formal opn. No. 93-374, reprinted in ABA Lawyer's Manual on Prof. Conduct, *supra,* at pp. 1001:187–1001:188 [a corporation's pecuniary interest in attorney fees is not of concern when the corporation is not for profit and the fees are statutory and are paid by the opposing party].)

The constitutional principles described *ante* have been applied to disapprove a state rule of practice that, as Frye would have us interpret section 13406(b), clearly prohibited the corporate practice of law except *only* for nonprofit corporations that are both (1) composed *entirely* of attorneys, and (2) devoted *solely* to serving the poor. (*In re N.H. Disabilities Rights Center, Inc.* (1988) 130 N.H. 328 [541 A.2d 208].) Justice Souter, then writing for the New Hampshire Supreme Court, determined that both restrictions fell afoul of the line of cases beginning with *NAACP v. Button* and could not be enforced against the Disability Rights Center, an organization that undertook litigation to further the rights of disabled persons. (*In re N.H. Disabilities Rights Center, Inc., supra,* 541 A.2d at pp. 212–215.)

■ According to Justice Souter, decisions by the United States Supreme Court establish that "[o]rganizations, their members and their staff lawyers may assert a protected first amendment right of associating for non-commercial purposes to advocate the enforcement of legal and constitutional rights of those members, or of others within a definite class whom the organization exists to serve. When such advocacy may reasonably include the provision of legal advice or take the form of litigation, the

organization may itself provide legal representation to its members or beneficiaries despite State regulations restricting legal practice and the solicitation of clients, provided that the organization and its lawyers do not engage in the specific evils that the general State regulations are intended to prevent." (*In re N. H. Disability Rights Center, Inc., supra,* 541 A.2d at p. 213.)

The New Hampshire decision acknowledged the state interests served by the ban on the corporate practice of law—to ensure attorney loyalty to clients by requiring that all directors and members of law corporations be lawyers, and to preserve the court's disciplinary authority over the practice of law. Nonetheless, the court agreed with the Disability Rights Center that the salutary objectives of the prohibition on corporate practice "must yield to first amendment values when their enforcement is *unjustified by any specific and immediate threat of the evils the requirements are intended to insure against. . . .*" (*In re N. H. Disability Rights Center, Inc., supra,* 541 A.2d at p. 215, italics added.) Thus, although the state theorized that the Disability Rights Center's lawyers might experience a conflict between the ideological goals of the directors of the organization and the interests of the individual clients, the court concluded that the "general possibility of conflicting interests" did not warrant enforcement of the state statute, which "compromise[d] a demonstrated first amendment interest." (*Ibid.*)

The foregoing decisions persuade us that the associational interests of persons wishing to join together to gain meaningful access to the courts for redress of grievances would be implicated by section 13406(b)'s requirement that the directors and entire membership of the corporation be composed of persons who are licensed to practice law. As the various amicus curiae briefs have explained, a great number of advocacy organizations set objectives and define their mission through governing boards that include constituent members, community members, and others who may not be attorneys. (See, e.g., 45 C.F.R. § 1607.3(c) & (d) (2005)) [corporate grantees of the Legal Services Corporation must include clients and other nonattorney representatives of the community on their governing boards].) These organizations turn to nonattorney board members for expertise and advice when making the decision to undertake litigation intended to advance the organization's goals. Similarly, the expressive and associational interests of attorneys, members, and supporters of advocacy groups would be implicated by a rule that would restrict the group's advocacy to litigation on behalf of the poor. As several nonprofit organizations have explained in amicus curiae briefs filed on behalf of THC, such organizations entertain many protected expressive goals other than service to low-income persons.

■ We conclude that these considerations weigh against interpreting section 13406(b) in the manner adopted by the Court of Appeal. Grave First

Amendment questions would be raised by the Court of Appeal's interpretation of section 13406(b), whereas our contrary view appropriately interprets the statute so as to avoid the conclusion that the Legislature intended to enact an unconstitutional statute. (See *Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1146 [131 Cal.Rptr.2d 29, 63 P.3d 937] [presuming that the Legislature does not intend to enact unconstitutional provisions]; see also *Ashwander v. Valley Authority* (1936) 297 U.S. 288, 348 [80 L.Ed. 688, 56 S.Ct. 466]; *People v. Davenport* (1985) 41 Cal.3d 247, 264 [221 Cal.Rptr. 794, 710 P.2d 861] [construing statutory language so as to avoid serious constitutional questions].)[8]

## D

We return to the issue of the intent of our own Legislature in enacting section 13406(b). In light of the background against which the measure was adopted and the constitutional issues that would be presented under the Court of Appeal's view that section 13406(b) was intended to govern all nonprofit corporations that supply legal services to third parties, we find unpersuasive the conclusion reached by that court. The historical development of the rule against corporate practice of law and the rule's exceptions make it clear that, as the Legislature was well aware when it enacted section 13406(b), the common law prohibition was not as monolithic as the Court of Appeal seems to have believed, but rather was subject to various exceptions.

Not only does the historical background discussed above render the Court of Appeal's interpretation of the intended reach of the statute implausible, but the text and legislative history of section 13406(b) also fail to support that court's view of the preclusive effect of the statute. The Professional Corporation Act does not require that every corporation employing an attorney to represent third parties must *be* a professional corporation.[9] Nor does the language of section 13406(b) state that the statute serves as the exclusive source of

---

[8] Contrary to Frye's claim, section 13406(b)(2)(C) (providing an exception when "[s]eventy percent of the clients to whom the corporation provides legal services are lower income persons . . . . and . . . other persons who would not otherwise have access to legal services") does not broaden the group of permitted clients to accommodate First Amendment concerns, because many advocacy groups and their members are not lower income or without access to legal services. Nor can we accept Frye's proposal that advocacy groups can retain their right of expression and right of access to the courts under section 13406(b) by splitting into two groups, only one of which undertakes litigation. Under section 13406(b), the permissible aims of the proposed litigation group still would be restricted in a manner inconsistent with the First Amendment principles we have discussed.

[9] See section 13402, subdivision (a) and *Gafcon, Inc. v. Ponsor & Associates* (2002) 98 Cal.App.4th 1388, 1405–1406 [120 Cal.Rptr.2d 392] (it did not constitute unauthorized practice of law for an insurance company, which obviously was not organized as a professional law corporation, to provide attorneys to defend its insureds in tort actions).

authority for nonprofit corporations to employ attorneys, or that common law sources of such authority are abrogated. The legislative history of the enactment makes it evident that it represented an effort to supply an explicit *extension of* authorization for the corporate practice of law in order to solve a limited problem, not to overturn past practices or to restrict nonprofit corporate practice of law by advocacy groups.

The Legislature's intent to expand nonprofit corporate practice apparently emanated from its desire to ensure the continued functioning of a particular nonprofit law office. In 1992, the Community Law Center of Oakland asked the Attorney General whether it could incorporate as a law corporation under the nonprofit public benefit corporation provisions. The Oakland law center was concerned that it might not be authorized to so incorporate because, unlike a pure legal aid society practice, it accepted fees from clients who had low incomes but were not indigent, and it engaged in a general law practice, primarily in the area of family law. The law center secured an Attorney General opinion on the question, the validity of which is not before us in the present case. The opinion concluded that the nonstatutory legal aid exception to the judicial prohibition on the corporate practice of law was limited to *free* legal services to indigents, whereas the Oakland law center did not limit its services to indigent persons and charged for its services. (75 Ops.Cal.Atty.Gen. 92, 93 (1992).) In the Attorney General's opinion, the center also did not constitute a membership organization serving the common interests of its members. The opinion concluded that "the Center is not engaged in any form of political expression in terms of advocating the unique legal or constitutional interests of the poor. Instead, it is engaged in a general law practice, primarily in the family law field." (*Id.* at p. 96.)

The Legislature enacted section 13406(b) in response to the Oakland law center's predicament, taking into account the 1992 Attorney General opinion. (Assem. Com. on Judiciary, Analysis of Sen. Bill No. 312 (1993–1994 Reg. Sess.) as amended June 22, 1993.) The Legislature intended to ensure that the Oakland law center was authorized to practice law as a nonprofit corporation despite its deviation from the pure legal aid model in that its services were not always free and it served persons who were not indigent. (*Ibid.*)

We agree with THC that the Legislature intended to *broaden* rather than restrict the existing legal aid exception to the ban on corporate practice of law to include organizations providing legal services to the working poor for a fee. Evidence of the Legislature's intent to *expand* nonprofit practice of law includes language such as the following: "[T]his bill will enable the Center, and similarly situated legal providers, to provide *additional legal services* on a more stable basis. [¶] There is no serious question that low-income persons, or the working poor, are increasingly unable to afford legal services. It is

critical that *alternative means* of delivery of legal services to the poor be developed. SB 312 is an effort to facilitate the delivery of legal services to this presently underserved segment of the population." (Assem. Com. on Judiciary, analysis of Sen. Bill No. 312 (1993–1994 Reg. Sess.) June 30, 1993, p. 1, italics added; see also Sen. Rules Com., analysis of Sen. Bill No. 312 (1993–1994 Reg. Sess.) May 3, 1993, p. 2 ["There is no provision in law for a law firm to incorporate as a non-profit. This change would allow them (Community Law Center) and others in the state to serve the poor and working poor as non-profit corporations"].)

It is significant that Frye is unable to point to any element of the legislative history suggesting an intent to *restrict* the preexisting authority of nonprofit corporations to practice law. Accordingly, the historical impetus for the legislation and the analyses relied upon by the Legislature dispel any suggestion that the Legislature intended the restrictive meaning attributed by the Court of Appeal to the enactment of section 13406(b).

█ We conclude, on the basis of the evident legislative intent to expand the nonprofit practice of law, the historical exceptions to the common law rule prohibiting nonprofit law practice, and the constitutional problems that would be presented by the Court of Appeal's interpretation, that section 13406(b) cannot be construed to govern all nonprofit corporations that provide legal services to third parties.

## III

### A

The remaining question before us involves the authority under which THC may practice law in the corporate form. THC claims it is an advocacy group that must be permitted to practice law under the authority of *NAACP v. Button, supra*, 371 U.S. 415, and its progeny. The Court of Appeal concluded THC is *not* an advocacy group but, as noted above, it did so in the unusual context of THC's claim that section 13406(b) could not be applied *retroactively* to the fee agreement between Frye and THC, which predated the measure's 1994 effective date. Starting with the premise that, even prior to the enactment of section 13406(b), there was a general rule against the corporate practice of law, the Court of Appeal found that the exceptions to that general rule—for legal aid societies, mutual benefit groups, and advocacy organizations—were narrow. Although THC claimed authority to practice law in the corporate form under the advocacy-group exemption, the Court of Appeal concluded that

THC's claim extended the rationale of *NAACP v. Button, supra,* 371 U.S. 415, beyond its assertedly narrow factual setting—specifically, beyond the context of a state law prohibiting solicitation of clients that was applied to an organization that clearly employed litigation as a form of political expression. The Court of Appeal denied the assertion that the relevant statutes implicated First Amendment interests. The court's terse conclusion was: "THC has failed to establish that the litigation it pursues is a form of political expression. On the facts before us, requiring THC to register with the State Bar presents no First Amendment concerns."

The claim that *NAACP v. Button, supra,* 371 U.S. 415, and its progeny created a narrow rule that would *not even be implicated* by restrictions such as those imposed by section 13406(b) and Business and Professions Code section 6160 already has been rebutted in our earlier discussion of the potential constitutional issues that would be raised by the Court of Appeal's conclusion that those statutes occupy the field of nonprofit corporate law practice in this state to the exclusion of any other rule. Contrary to the Court of Appeal's assertion, the issue does not merely involve the simple act of registering with the State Bar. The registration requirement itself, under the Court of Appeal's interpretation of section 13406(b), would require as a condition of registration that the organization limit its directors and members to licensed attorneys, and limit its clientele as described in that statute.

The Court of Appeal's next conclusion—that, as a factual matter, THC is not an advocacy group because the evidence does not demonstrate that it employs litigation as a form of political expression—requires a separate analysis. Frye expands upon the Court of Appeal's brief discussion, asserting that THC is not an advocacy group but simply constitutes an ordinary law firm that, in fact, is engaged in a general landlord-tenant practice. He claims that THC's law practice consists not of bringing test cases or class action lawsuits, but rather of defending individual tenants threatened with eviction or undergoing tenancy in uninhabitable dwellings.

Contrary to the view of the Court of Appeal, the United States Supreme Court has made it clear that the principles set out in *NAACP v. Button, supra,* 371 U.S. 415, are not limited to political advocacy groups. "[T]he First Amendment does not protect speech and assembly only to the extent it can be characterized as political." (*Mine Workers, supra,* 389 U.S. at p. 223.) Justice Souter made the same point in the previously discussed decision he authored for the New Hampshire Supreme Court. (*In re N.H. Disabilities Rights Center, Inc., supra,* 541 A.2d at p. 213 ["Organizations, their members and their staff lawyers may assert a protected first amendment right of associating for non-commercial purposes to advocate the enforcement of legal and constitutional rights of those members, or of others within a definite class whom the organization exists to serve"].)

The conclusion of the Court of Appeal that, as a factual matter, THC does not qualify as a protected advocacy group is questionable on the present record, in light of the goals stated in THC's charter and bylaws and the community of interested persons it exists to serve, the ostensible relationship of its landlord-tenant litigation to its broader goal of maintaining the residential nature of the Tenderloin district and preserving low-income housing stock, and the circumstance that, at least in the years noted in the record, THC was approved by the Internal Revenue Service as an organization broadly devoted to promoting the public interest, a requirement for tax-exempt status. (See Rev.Proc. 92-59, 1992-2 C.B. 411, § 3; see also *id.*, § 4 [permitting public interest organizations under limited circumstances to exact fees from clients rather than from the opposing party]; 26 C.F.R. § 601.201 (2005).)

Because of the procedural posture of the present case, however, we are not called upon to render a final determination on the question whether THC's structure and activities demonstrate that it is an advocacy group within the meaning of *NAACP v. Button, supra,* 371 U.S. 415. We note that in that case, the high court examined an extensive *record* to determine whether the NAACP's activities were protected by the First Amendment to the extent that a state law prohibiting the organization from soliciting clients could not constitutionally be applied to it. A full record of the union's practices was also apparently before the court in *Mine Workers, supra,* 389 U.S. 217, as was a record of the ACLU's practices in *In re Primus, supra,* 436 U.S. 412. The record was useful to the court not only to determine the nature of the advocacy group's work but also to determine whether the state had demonstrated a compelling need to impose its regulations on the group.

Because of the procedural posture of the present case, a full record was not developed. THC did not have an adequate opportunity to litigate the questions whether it was engaged in activities warranting First Amendment protection or the extent to which it earned a profit from the attorney fees it charged. The trial court that granted the judgment on the pleadings under review in the present case did *not* resolve the factual issue of the nature of THC's activities. Instead, *prior to the completion of discovery* on issues such as the allegedly profitable nature of THC's law practice, and *prior to trial,* the trial court concluded THC was entitled to judgment on the pleadings upon *another* ground—an issue involving remedy. The trial court found that, even if Frye was correct that THC was an ordinary law firm engaged in the unauthorized practice of law rather than an advocacy group, and that it should have registered and complied with section 13406(b), THC's failure to do so did not justify the remedy of disgorgement of statutory attorney fees to Frye, because Frye was not injured by THC's failure to register or to comply with section 13406(b).

Although we could remand this case to permit development of a full evidentiary record concerning THC's organization and activities in order to permit an appropriate determination whether its practice falls within the protection of *NAACP v. Button, supra*, 371 U.S. 415, and its progeny, we need not prolong litigation that already has consumed many years. We agree with the trial court, on another ground, that Frye was not entitled to relief; the remedy he sought was not available to him, for the reasons that follow.

## B

We examine the trial court's alternative ground for granting judgment on the pleadings. We agree with that court that THC's failure to register with the State Bar or to comply with section 13406(b) was not a cause of any injury to Frye. Under no imaginable circumstance would Frye have fared better had THC registered with the State Bar and complied with section 13406(b). The trial court in the underlying landlord-tenant action still would have awarded the same statutory attorney fees to compensate THC for its efforts, and THC still would have refunded to Frye the fees it collected in excess of the statutory fees pursuant to the contingency fee agreement. Indeed, the Court of Appeal itself, in affirming the trial court's grant of summary judgment in favor of THC on Frye's causes of action for fraud and misrepresentation, reached the conclusion that Frye had not been injured.

Under these circumstances, "[t]o require disgorgement of fees because of a failure to register the corporation . . . is disproportionate to the wrong." (*Olson, supra*, 106 Cal.App.4th at p. 1215 [equitable considerations did not support an order for disgorgement of earned fees when a licensed attorney failed to register his for-profit law corporation as required by statute].) And with respect to any claim for misrepresentation or concealment, there was no damage. (See *id.* at pp. 1216–1217; see also *Ford Motor Credit Co. v. Sperry* (2005) 214 Ill.2d 371 [292 Ill.Dec. 893, 827 N.E.2d 422, 432] ["there is a fundamental difference between an unlicensed individual representing a party . . . and duly licensed attorneys who happen to belong to a law firm that has not filed its registration and paid its fees"].)

Frye responds that "nonlawyers cannot recover fees for practicing law," citing *Birbrower, Montalbano, Condon & Frank v. Superior Court* (1998) 17 Cal.4th 119 [70 Cal.Rptr.2d 304, 949 P.2d 1]. In *Birbrower*, we concluded that an out-of-state law firm was not entitled to a judgment enforcing its client's obligations under a fee agreement for legal services rendered in California,

because neither the firm *nor its lawyers* were authorized to practice law in California. *Birbrower* is inapposite. It concerned a law firm's action to recover *contractual* fees owed by its client. The question in the present case is whether Frye, the plaintiff tenant for whom THC won a favorable judgment, is entitled to *statutory* attorney fees that the court ordered *the defendant landlords* in the underlying action to pay—despite the contract assigning such fees to THC and despite the circumstance that the defendant landlords paid the fees without objecting that THC was not authorized to practice law.

The Court of Appeal in the present case concluded that the contract between Frye and THC contained a "prohibited" contingent fee provision, and Frye reiterates his assertion that he suffered actual injury by virtue of the assertedly prohibited contingent fee provision. THC, however, repaid Frye the contingency fee plus interest, so Frye did not suffer injury. Frye also contends THC would not have been entitled to undertake to represent him in the underlying action had it been properly registered, but this circumstance, even if true, does not support his claim that he was injured by their legal representation, which resulted in a judgment in his favor.

Frye claims that disgorgement is necessary to prevent THC from profiting by its wrongdoing. Similarly, the Court of Appeal believed disgorgement was necessary because, unlike the attorney in the *Olson* case, THC obstinately refused to acknowledge its alleged duty to register with the State Bar.

The circumstances that the State Bar has permitted numerous nonprofit organizations to practice law without registering or complying with section 13406(b) and that this court and other courts frequently award statutory attorney fees to such nonprofit corporations[10] demonstrate that the Court of Appeal was misguided and that Frye's punitive demands are misplaced. Only five of the hundreds of nonprofit organizations that offer legal services in this state have registered with the State Bar. Amicus curiae briefing we have received from some of these groups, representing the full political spectrum, indicates that the organizations share THC's view that, under current law, they are not required to register with the State Bar or comply with section 13406(b). The State Bar itself urges that disgorgement would be unfair, because the State Bar has *not enforced* section 13406(b).

---

[10] This court has approved substantial fee awards to such organizations. (*Press v. Lucky Stores, Inc.* (1983) 34 Cal.3d 311, 318–321 [193 Cal.Rptr. 900, 667 P.2d 704]; *Serrano v. Priest* (1977) 20 Cal.3d 25, 44–47 [141 Cal.Rptr. 315, 569 P.2d 1303].)

Under the Court of Appeal's rationale, all the statutory attorney fees that unsuccessful defendants have paid to nonprofit corporations in this state since 1994 should be disgorged to *clients* who did not pay fees and for whom the corporation won a favorable judgment—despite this court's recognition that the award of attorney fees to such organizations serves the public interest by providing financial support for the organizations. (See *Serrano v. Priest, supra,* 20 Cal.3d at pp. 44–47; see also *Press v. Lucky Stores, Inc., supra,* 34 Cal.3d at pp. 318–321.) As one commentator has observed, adequately funded public interest litigation constitutes a "unique and indispensable vehicle through which citizens can systematically sponsor and assist litigation advancing broad public interests." (Simon, *Fee Sharing Between Lawyers and Public Interest Groups* (1989) 98 Yale L.J. 1069, 1114.) The remedy of disgorgement is grossly disproportionate to the asserted wrongdoing on THC's part and would constitute a totally unwarranted windfall to Frye.

We conclude that the trial court correctly granted judgment on the pleadings in favor of THC on the issue of remedy.

### IV

This court has the authority to consider imposing registration requirements and other restrictions on the practice of law by nonprofit corporations pursuant to its "inherent responsibility and authority over the core functions of admission and discipline of attorneys." (*In re Attorney Discipline System, supra,* 19 Cal.4th at pp. 603, 606–607; see also *Merco Constr. Engineers, Inc. v. Municipal Court* (1978) 21 Cal.3d 724, 727, 730–731 [147 Cal.Rptr. 631, 581 P.2d 636].)

In view of the State Bar's experience in regulating the practice of law, its knowledge of the practical problems presented by various forms of law practice, and its ability to seek information and recommendations from the legal community and other interested persons, we believe the matter should be referred to the State Bar for further study, followed by a report and specific recommendations to this court. After appropriate study and specific recommendations from the State Bar, we shall consider the implementation of carefully drawn regulations directed at the practice of law by nonprofit corporations, if such regulations meet a demonstrated danger of injury to clients without impairing First Amendment expressive and associational rights.

Our dominant concern when we adopted the general rule prohibiting corporations from employing attorneys to represent third parties was to protect clients from conflicts of interest that we viewed as inevitably flowing from the profit motive with which corporations are imbued. The profit motive being absent in the case of nonprofit corporations, it may be that additional

regulation of groups such as THC is not needed. It is incumbent upon the State Bar to study whether groups such as THC *actually* imperil client interests despite the absence of a profit motive, and to consider how such a danger, if it exists, may be mitigated by regulations consistent with First Amendment principles. Specifically, such regulations must reasonably accommodate the expressive and associational interests of nonprofit organizations and their members.

The State Bar may consider the New Jersey Supreme Court's concern that a nonprofit organization's ideological motivation might pose a risk to client interests. (See *In re Education Law Center, Inc.* (1981) 86 N.J. 124 [429 A.2d 1051, 1057].) According to that court, concerns similar to those arising from law practice by a for-profit law corporation might arise when nonprofit organizations controlled by nonlawyers pursue political and ideological goals through litigation. According to the New Jersey court, despite their personal obligations as members of the state bar, staff attorneys hired, employed, and compensated by such organizations might well feel that their duty to the organization conflicts with their duty to pursue the best interest of the client. Reasonable regulation, directed at the employing entities as well as their individual lawyers and designed to govern the day-to-day conduct of litigation, may be appropriate. On the other hand, the State Bar should recognize that, in its decision, the New Jersey Supreme Court was not called upon to comment upon potential *constitutional* limitations on its authority to restrict the practice of law by advocacy groups.[11]

In studying the foregoing issue, reporting to this court, and proposing specific additional regulations for this court's consideration, the State Bar also should consider whether existing ethical rules applicable to individual attorneys already afford adequate safeguards to clients.

---

[11] The New Jersey Supreme Court eventually approved a proposed rule for nonprofit organizations that imposes conditions substantially similar to those imposed by our own rules upon individual attorneys: "Nonprofit organizations incorporated in this or any other state for the purpose of providing legal services to the poor or functioning as a public interest law firm, and other federally tax exempt legal services organizations or trusts, such as those defined by 26 U.S.C.A. 120(b) and 501(c)(20), that provide legal services to a defined and limited class of clients, may practice law in their own names through staff attorneys who are members of the bar of the State of New Jersey, provided that: (1) the legal work serves the intended beneficiaries of the organizational purpose, (2) the staff attorney responsible for the matter signs all papers prepared by the organization, and (3) *the relationship between staff attorney and client meets the attorney's professional responsibilities to the client and is not subject to interference, control, or direction by the organization's board or employees except for a supervising attorney who is a member of the New Jersey bar.*" (N.J. Rules of Court, Rules of General Application, rule 1:21-1(e), italics added.) As noted, however, the New Jersey high court did not consider constitutional issues in its decision in *In re Education Law Center, Inc.*, *supra*, 429 A.2d 1051, which apparently served as the catalyst for the rule of court quoted above.

With respect to existing regulations, the State Bar possesses disciplinary authority over all members of the bar, including those who are employed by nonprofit corporations such as THC. (Bus. & Prof. Code, §§ 6077, 6078.) Of particular note is rule 1-600(A) of the California Rules of Professional Conduct, which provides: "A member shall not participate in a nongovernmental program, activity, or organization furnishing, recommending, or paying for legal services, *which allows any third person or organization to interfere with the member's independence of professional judgment, or with the client-lawyer relationship*, or allows unlicensed persons to practice law, or allows any third person or organization to receive directly or indirectly any part of the consideration paid to the member except as permitted by these rules, or otherwise violates the State Bar Act or these rules." (Italics added.)

Furthermore, each attorney is under a duty to maintain client confidences (Bus. & Prof. Code, § 6068, subd. (e); Rules of Prof. Conduct, rule 3-100), and attorneys are required to avoid interests adverse to those of their clients. (Rules of Prof. Conduct, rules 3-300, 3-310.) In a provision of particular relevance to attorneys employed by organizations such as THC, the Rules of Professional Conduct provide that attorneys may accept compensation for their services from persons other than the client only when "[t]here is no interference with the member's independence of professional judgment or with the client-lawyer relationship," the attorney maintains client confidences and, ordinarily, the attorney "obtains the client's informed written consent." (Rules of Prof. Conduct, rule 3-310(F).)[12]

---

[12] Compare American Bar Association Model Rules of Professional Conduct (ABA Model Rules), rule 1.2(a) (requiring attorneys to "abide by a client's decisions concerning the objectives of representation"), rule 1.7 (prohibiting an attorney from representing a client when the attorney owes a duty to a third party that may create a conflict of interest), rule 1.8(f) ("A lawyer shall not accept compensation for representing a client from one other than the client unless: [¶] (1) The client gives informed consent; [¶] (2) there is no interference with the lawyer's independence of professional judgment or with the client-lawyer relationship"), and rule 5.4 ("(a) A lawyer or law firm may not share legal fees with a nonlawyer, except that: [¶] . . . [¶] (4) a lawyer may share court-awarded legal fees with a nonprofit organization that employed, retained or recommended employment of the lawyer in the matter. [¶] . . . [¶] (c) A lawyer shall not permit a person who recommends, employs, or pays the lawyer to render legal services for another to direct or regulate the lawyer's professional judgment in rendering such legal services"); California State Bar Rules Regulating Interest-Bearing Trust Fund Accounts for the Provision of Legal Services to Indigent Persons, rule 3 ("No provision of these rules or of the . . . Business and Professions Code shall limit or impair in any way the professional responsibility of any attorney to his or her client to provide such client with legal services appropriate to the client's needs"); see Giesel, *supra*, 65 Mo. L.Rev. at pages 206–207 (contending that the ABA Model Rules adequately address concerns regarding corporate practice of law and that the general ban on corporate practice of law should be abandoned).

We note that although California has not adopted the ABA Model Rules, they may be "helpful and persuasive in situations where the coverage of our Rules is unclear or inadequate." (1 Witkin, Cal. Procedure (4th ed. 1997) Attorneys, § 418, p. 508; see also *State Comp.*

Finally, the Attorney General is vested with authority to bring actions to challenge a nonprofit public benefit corporation's failure to comply with its charitable mission or corporate charter. (§§ 5250, 6216; see also §§ 5141, 5142.) Nonprofit public benefit corporations are required to register with the Secretary of State and to register annually with the Attorney General. (§ 6210; Gov. Code, § 12585–12587.) Annual reports must include certain financial transactions, nonprogram expenditures, use of professional fundraisers, receipt of government funds, and certain IRS reporting requirements. (2 Advising Cal. Nonprofit Corporations (Cont.Ed.Bar 2d ed. 1998) § 1140, pp. 611–612.) "Public benefit corporations are subject to examination by the Attorney General at all times to ascertain the extent to which they may have departed from the purposes for which they were formed or have failed to comply with [the requirements of the] charitable trusts they have assumed. The Attorney General may institute any proceedings necessary to correct such a departure or noncompliance," including proceedings to compel compliance with statutes governing nonprofit corporations. (1 Advising Cal. Nonprofit Corporations, *supra*, § 8.115, pp. 397–398.) In addition, public interest law firms seeking to maintain nonprofit status for the purpose of compliance with 26 U.S.C. § 501(c) are subject to oversight by the Internal Revenue Service, both with respect to their public purpose and the circumstances under which they may accept fees from clients or through judicial awards. (Rev. Proc. 92-59, 1992-2 C.B. 411, § 4.)

In sum, in considering the practical need for additional regulation in California, the State Bar should reflect upon the rationale supporting the rule against the corporate practice of law as well as the constitutional principles discussed in this opinion, determine whether there is evidence of actual abuse or client endangerment, and consider whether the potential for harm to clients warrants regulation of the nonprofit entity itself.

The question whether additional regulation is required is referred to the State Bar for further study and report to this court.

---

*Ins. Fund v. WPS, Inc.* (1999) 70 Cal.App.4th 644, 656 [82 Cal.Rptr.2d 799].) The ABA Model Rules are not binding, of course. (*General Dynamics Corp. v. Superior Court* (1994) 7 Cal.4th 1164, 1190, fn. 6 [32 Cal.Rptr.2d 1, 876 P.2d 487].)

## V

For the foregoing reasons, the judgment of the Court of Appeal, reversing the trial court's grant of judgment on the pleadings as to the causes of action for money had and received and breach of fiduciary duty, is reversed.

Kennard, J., Baxter, J., Werdegar, J., Chin, J., Moreno, J., and Corrigan, J., concurred.